IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

GLEN AARON MILLER,

    Plaintiff,

v.                               Civil Action No.  1:12CV37
                                  (The Honorable Irene M. Keeley)

MICHAEL J. ASTRUE,
Commissioner of Social Security,

    Defendant.

## REPORT AND RECOMMENDATION/OPINION

Glen Aaron Miller ("Plaintiff") brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Defendant," and sometimes "Commissioner") denying his claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Civ. P. 9.02.

## I. Procedural History

Plaintiff protectively filed applications for DIB and SSI on October 10, 2008, alleging disability on October 1, 2007, due to "two discs blown out on back, nerve damage in back, severe anxiety, panic attacks, right leg swells" (R. 134, 139, 180). Plaintiff's applications were denied at the initial and reconsideration levels (R. 69-62). Plaintiff requested a hearing, which Administrative Law Judge Norma Cannon ( "ALJ"), held on September 22, 2010 (R. 35). Plaintiff, represented by counsel, and Vocational Expert Eugene Czuczman ("VE") testified (R. 36-68). On November 12,

2010, the ALJ entered a decision finding Plaintiff was not disabled through the date of the decision (R. 17-28). On November 11, 2011, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 6-11).

## II. Statement of Facts

Plaintiff was born on May 21, 1976, and was thirty-four (34) years old on the date of the administrative hearing (R. 30). Plaintiff attended school through the twelfth grade; he did not graduate. He withdrew on May 25, 1994, the end of his senior year, for failing grades (R. 39, 308-09). Plaintiff's past work was part-time at a salon from July, 2008, to March, 2009 (R. 41-43). Plaintiff also worked as a salon manager from 1999 to 2007 (R. 43-44).

Plaintiff was involved in a motor vehicle accident on July 17, 2007. He presented to the emergency department of Reynolds Memorial Hospital and reported his vehicle was struck on the passenger's side by another vehicle. Plaintiff did not strike his head; he did not experience unconsciousness; he had been wearing his seatbelt. Two (2) hours after the accident, he experienced back, right flank, and right buttock pain. His pelvis x-ray was normal. He was prescribed Motrin 800mg and released (R. 298-300, 328, 388).

Plaintiff presented to Dr. Mason on August 3, 2007, with "pretty severe right paralumbar tightness" that was "starting to affect his left side." Upon examination, Dr. Mason found paralumbar tightness from "[a]round L2, down to the sacral levels." Plaintiff's gait was normal; he did not limp; no neurologic deficits were noted. Plaintiff continued to work. Dr. Mason provided Skelaxin samples and ordered lumbar x-rays (R. 306, 316, 376).

Plaintiff's August 3, 2007, lumbar spine x-ray showed Grade I spondylolisthesis of L5 "in respect to S1, with spondylolysis present in the neural arch at L5"; L5/S1 disc space narrowing;

spinal bifida occulta of S1; and metal clips overlying the pelvis and possibly the upper abdomen (R. 296-97, 326-27, 385). Dr. Mason noted the x-ray revealed a "potential staple" on Plaintiff's pelvis. Plaintiff stated he had undergone a laparoscopic cholecystectomy in 2002; Dr. Mason noted Plaintiff could "go back and talk to the surgeons to find out, if (sic) indeed, this [was] what the foreign object [was]." Dr. Mason noted he was unsure if the object was something Plaintiff could "leave be" since it had not caused "any infectious process at this juncture" (R. 307, 317, 372, 377).

Dr. Mason examined Plaintiff on August 20, 2007, for right and left lumbar muscle pain. Plaintiff informed Dr. Mason that the pain affected how stood at work. Upon examination, Dr. Mason found Plaintiff had right back spasm and "the left-hand side [was] starting to get involved . . . ." There was "some" point tenderness along the paralumbar region on the right to the sacral area. Dr. Mason ordered physical therapy (R. 306, 316, 376).

On August 27, 29, 30, and September 4, 10, 12, 13, 20, 21, 2007, Plaintiff participated in physical therapy. He realized "only temporary relief" therefrom (R. 288-95, 329-30, 389-90).

On September 17, 2007, Plaintiff reported to Dr. Mason that physical therapy provided "very minimal relief." Dr. Mason ordered a CT scan. Upon paralumbar examination, Dr. Mason noted Plaintiff had "some tight muscles, both sides" and pain upon palpation (R. 305, 315, 375).

Plaintiff's September 19, 2007, CT scan of his lumbar spine showed narrowing of the L3-L4 disc space "with diffuse annular bulge of the disc noted, but no significant spinal stenosis or encroachment on the neural foramina" was detected; and "Grade I spondylolisthesis of L5 onto S1 with bilateral spondylolysis of the pars interarticularis of L5." There appeared to be a "right lateral herniated disc demonstrated at L5-S1 on the right, which [was] starting to compress the nerve root on that side." A MRI was recommended (R. 281, 324-25, 386).

Plaintiff's September 19, 2007, abdominal CT scan showed "mild fatty metamorphosis to the liver with cholecystectomy" and "increased density overlaying the left side of the pelvis just posterior to the seminal vesicle," which was "more than calcium-like density involving the mesenteric fat in that area." No other "metallic densities [were] seen except for the gallbladder fossa where a cholecystectomy had been performed" (R. 282, 323, 371).

Plaintiff presented to Dr. Mason on September 20, 2007, for review of the CT scans. Dr. Mason found Plaintiff had a herniated disc at L5-S1 that was "actually pressing on the nerve root on that side" and noted he wanted to "get [Plaintiff] to a neurosurgeon ASAP." Upon examination, Dr. Mason found Plaintiff had some paralumbar spasm (R. 305, 315, 375).

Plaintiff complained of "anxiety issues" to Dr. Mason on October 10, 2007. Dr. Mason "believe[d] because everything has happened to [Plaintiff] in the past month or so, he [was] having panic attacks." Plaintiff stated the attacks occurred "in the car, at work, at home." He stated he became short of breath and nauseated; he had vomited "at times." Dr. Mason "[wrote] him to be off work now" and prescribed Lexapro (R. 304, 314, 374).

Except for high cholesterol and triglycerides, Plaintiff's October 25, 2007, blood work results were normal (R. 283-86, 319-22).

Plaintiff complained of anxiety and crying to Dr. Mason on October 25, 2007. Plaintiff reported he could not "retain food." He did not have suicidal ideations or want a psychological evaluation. Dr. Mason discontinued Lexapro and prescribed Effexor (R. 304, 314, 374).

On November 7, 2007, Dr. Mason examined Plaintiff for "followup for initiation of Effexor." Dr. Mason noted Effexor was "doing well for him" and Plaintiff was "doing much better from that standpoint" (R. 303, 304, 313, 373, 374).

4

Dr. Hargraves, a neurologist, completed a consultative examination of Plaintiff on November 11, 2007, relative to low back, thigh, and right-buttock pain. Upon examination, Dr. Hargraves found Plaintiff's motor strength was 5/5, knee reflexes were 2+, and ankle reflexes were 1+. Plaintiff had no pathological reflexes. Dr. Hargraves reviewed Plaintiff's CT scan and noted it showed "grade 1 slip at L5-S1 with a bilateral pars defect"; "disk protrusion to the right at L5-S1"; and "degeneration of the 3-4 disk." Dr. Hargraves noted Plaintiff had "multitude of problems in the lumbar spine" but he was "not sure" if surgical intervention was warranted. He instructed Plaintiff to return in six (6) to eight (8) weeks (R. 301, 331, 392).

Plaintiff presented to Dr. Mason on March 31, 2008, with nausea, vomiting and vertigo. Dr. Mason decided to wean Plaintiff off Effexor over the next two weeks and prescribe Antivert because he thought Plaintiff had benign positional vertigo (R. 303, 313, 370, 373).

On October 7, 2008, Plaintiff's examination was normal. Dr. Mason noted he was going to "try [Plaintiff] on a mild nerve pill," prescribed Xanax, and diagnosed generalized anxiety (R. 312).

On December 15, 2008, Holly Coville, M.A., Ed.S., a licensed psychologist, completed an Adult Consultative Evaluation Report of Plaintiff. Plaintiff's hygiene and dress were good; his gross and fine motor functioning was intact. Plaintiff stated he had herniated discs and back swelling due to a 2007 motor vehicle accident. Plaintiff stated he had a hemoclip inside his body, which was left when his gallbladder was removed in 2002 (R. 332). Plaintiff said the clip was open and had "traveled from one side of [his] body to the other." He had gotten mixed responses as to whether he should have the hemoclip removed. Plaintiff feared the clip would puncture his vital organs. His back swelling made it difficult for him to get out of bed and to walk. He experienced daily pain; he was uncomfortable sitting and standing. Plaintiff stated his balance had been affected; he had

"problems" with circulation; his extremities were cold. He had had fluid drained from his knee. Plaintiff informed Ms. Coville that surgery had been recommended for his back, but he did not have insurance and could not afford it. Plaintiff reported he had experienced panic attacks since the motor vehicle accident. There were "days" he was unable to leave his home due to pain and panic; he did not leave his home after dark on "many days." Plaintiff stated that "riding in a car" elicited anxiety; he had "'amplified' speech and mannerisms"; he became confused and disoriented (R. 333).

Plaintiff reported he had difficulty falling asleep, intermittent awakening, restlessness, periods of nausea and shaking when awaking, decreased appetite, significant weight loss, increased crying, decreased energy level, anxious mood, passive thoughts of death, daily difficulty breathing, daily sweating, heart racing daily, dry heaves daily, no obsessive/compulsive behavior, no PTSD symptoms, amplified speech, difficulty processing speech, feeling confused and "'discombobulated,'" anhedonia, apathetic, feelings of hopelessness and helplessness, feelings of sadness, and being withdrawn (R. 333-34). Ms. Coville reviewed Plaintiff's records from his primary care physician, objective tests, and reports for Wheeling Hospital. Plaintiff reported he had received no inpatient or outpatient treatment. He had taken Effexor and Lexapro; he currently medicated with Xanax, temazepam and Meclizine (R. 334).

Plaintiff reported he worked four (4) days per week on a "flexible, part-time basis" at a hair salon. Plaintiff stated he had attempted to work in telemarketing, but he "only made it two weeks as he became ill. He went to another place for employment and his panic attacks became too severe to continue [the] job." Plaintiff lived with his parents (R. 334).

Upon mental status examination, Plaintiff was cooperative and motivated; his speech was relevant and coherent; he was oriented, times four (4); his mood was depressed and anxious; his affect was consistent with his mood; his concentration was mildly impaired; his thought processes

6

and content were normal; he had no hallucinations; he had no suicidal or homicidal ideations; his psychomotor activity was increased; his persistence was mildly impaired; and his insight, judgment, immediate memory, recent memory, remote memory, and pace were normal (R. 335).

Ms. Corville diagnosed Plaintiff with adjustment disorder with depressed mood "as a result of the accident and the injuries he sustained in 2007." Ms. Corville also diagnosed panic disorder, which was characterized by recurrent panic attacks and severe anxiety (R. 335). Plaintiff stated to Ms. Corville that he was seeking Social Security benefits so he could "receiv[e] the medical and mental health treatment that will improve his functioning and enable him to contribute more efficiently to the work force." Ms. Corville found Plaintiff's prognosis was fair and it would "improve with medical and mental health treatment." Ms. Corville found Plaintiff was independent in his daily tasks, but they were "often affected by pain and neglected due to mental health." Plaintiff was capable of managing benefits (R. 336).

On December 16, 2008, Dr. Mason that he had had a "long talk" with Plaintiff and they "[thought] a lot of his physical symptoms [were] related to anxiety, so [they were] not going to do any CAT scans, EEGs, or blood work at this time, but we [were] going to start him on Zoloft 50mg, along with his Xanax . . . ." Dr. Mason diagnosed generalized anxiety "with some intermittent anxiety attacks" and underlying depressive symptoms (R. 370).

On December 17, 2008, Dr. Schmitt completed an consultative orthopedic examination of Plaintiff. Plaintiff reported lumbar pain that radiated to the right lower extremity and right lower extremity numbness, tingling and buckling. Plaintiff stated he fell, on the average, four (4) times a week. Plaintiff stated he had difficulty "negotiating stairs or uneven terrain." Plaintiff's pain was eight (8) out of ten (10) at the worst and five (5) out of ten (10) at the best. Plaintiff complained of

7

knee arthralgias. He stated bending, stooping, sitting or standing for prolonged periods of time aggravate his back pain. Plaintiff stated he realized minimal relief from the use of opioids and muscle relaxers. He medicated with temazepam, alprazolam, sertraline and Advil (R. 338).

Upon examination, Dr. Schmitt found Plaintiff's vital signs, speech, hearing, coloring, eyes, mouth, throat, neck, chest, back, lungs, heart, abdomen, and extremities were normal (R. 339-40). Plaintiff's peripheral pulses were present, regular, and fully palpable in all extremities. Plaintiff's gait was slow and he limped on the right. His straight leg raising test was positive on the right at thirty (30) degrees and forty-five (45) degrees on the left. He had no paravertebral muscle spasm or deformities of the spinal column. Plaintiff could get up on and down from the examination table with mild difficulty. He could not heel and toe walk, squat or hop on the right knee. Plaintiff's ranges of motion were "free and full" except for the lumbar spine, "where ventral flexion is limited to 30 degrees." Plaintiff's lateral flexion was normal at 25 degrees. Plaintiff was alert and oriented; he had no impaired judgment, memory, constriction, or restriction of interests. His cranial nerves were intact. Plaintiff's cerebellar function was normal as to finger to nose, rapid alternating movements, heel to shin, and tandem gait. He had no atrophy or wasting. His muscle strength, size, and tone were all "adequate." Plaintiff had "decreased pinprick sensation at dermatome levels L4/L5 in the right lower extremity." His deep tendon reflexes were symmetrical and normal, bilaterally. His superficial reflexes were present and normal, bilaterally. His Babinski was normal; his plantar reflexes were down going (R. 340).

Dr. Schmitt found Plaintiff had a "history of back injury and clinical signs consistent with a herniated and/or bulging disc. CAT scan has confirmed this dated 9/19/2007." Dr. Schmitt's impressions were for multiple arthralgias, chronic low back syndrome, severe lumbar strain with

right radiculopathy, "decreased range of motion of lumbar spine for ADL," and "significantly impaired gait for ADL" (R. 340).

On December 23, 2008, Plaintiff reported to Dr. Mason that, even though he had had a few good days, he had increased nausea, anxiety, depression, and insomnia. Dr. Mason increased Plaintiff's dosage of Zoloft, prescribed Phenergan, and provided samples of Ambien (R. 370).

On January 6, 2009, Joseph Kuzniar, Ed.D., a state agency psychologist, completed a Mental Residual Functional Capacity Assessment of Plaintiff. He found the following as to Plaintiff's understanding and memory: not significantly limited in his ability to understand and remember detailed instructions; no evidence of limitation in his ability to remember locations and work-like procedures; and no evidence of limitation in his ability to understand and remember very short and simple instructions. He found the following relative to Plaintiff's ability to sustain concentration and persistence: not significantly limited in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, complete a normal work day and work week without interruptions for psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. Plaintiff was moderately limited in his ability to work in coordination with or proximity to others without being distracted by them. Plaintiff had no evidence of limitations in his ability to carry out very short and simple instructions, sustain an ordinary routine without special supervision, or make simple work-related decisions (R. 343-44). As to Plaintiff's social interaction limitations, Dr. Kuzniar found Plaintiff was not significantly limited in his ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, maintain socially appropriate behavior, and

to adhere to basic standards of neatness and cleanliness. Plaintiff was moderately limited in his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Plaintiff had no limitation in his ability to ask simple questions or request assistance. Dr. Kuzniar found the following as to Plaintiff's adaptation: not significantly limited in his ability to respond appropriately to changes in the work setting, travel in unfamiliar places, or use public transportation. Plaintiff had no limitations in his ability to be aware of normal hazards, take appropriate precautions, set realistic goals, or make plans independently of others (R. 344). Dr. Kuzniar found Plaintiff retained the "capacity to carry out routine instructions similar to those of his last employment." He could manage low demand social interaction. He had a "somewhat reduced" capacity for adaptation (R. 345).

Dr. Kuzniar completed a Psychiatric Review Technique of Plaintiff on January 6, 2009. He found Plaintiff positive for affective disorder, specifically adjustment disorder with depressed mood (R. 347, 350). He found Plaintiff positive for anxiety-related disorder, specifically "recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week" (R. 347, 352). Dr. Kuzniar found Plaintiff was mildly limited in his activities of daily living and ability to maintain concentration, persistence or pace. Plaintiff was moderately limited in his ability to maintain social functioning (R. 357). Dr. Kuzniar relied on the records of Dr. Mason and the mental status examination of Ms. Coville in making his findings (R. 359).

On January 12, 2009, Dr. Mason increased Plaintiff's dosage of Zoloft to 150mg to "help both the depressive and anxious symptoms." He diagnosed major depressive disorder and generalized anxiety disorder (R. 369, 606).

On January 12, 2009, Fulvio Franyutti, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff. Dr. Franyutti found Plaintiff could occasionally lift and/or carry twenty (20) pounds; frequently lift and/or carry ten (10) pounds; stand and/or walk for a total of about six (6) hours in an eight (8) hour workday; sit for a total of about six (6) hours in an eight (8) hour workday; and push/pull unlimited (R. 362). Dr. Franyutti found Plaintiff would be occasionally limited in his ability to climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; Plaintiff should never climb ladders, ropes or scaffolds (R. 363). Plaintiff had no visual, manipulative or communicative limitations (R. 364-65). Dr. Franyutti found Plaintiff's exposure to wetness, humidity, noise, fumes, odors, dusts, gases, and poor ventilation was unlimited; he should avoid concentrated exposure to extreme cold and heat, vibrations, and hazards (R. 365).

On February 2, 2009, Dr. Mason ordered a CT scan of Plaintiff's head, electroencephalogram ("EEG") and labs. Dr. Mason noted Plaintiff had no neurologic deficits or symptoms; he had "improvement [with] Zoloft." He continued Plaintiff's prescriptions for Zoloft, Xanax, Phenergan, and Ambien. Dr. Mason diagnosed generalized anxiety disorder and depression (R. 369, 606).

Plaintiff's February 10, 2009, blood work results were normal, except for high cholesterol and triglycerides. Dr. Mason noted "all excellent" on the report (R. 379-34, 394-98).

On February 22, 2009, Plaintiff presented to Robin Muir, Ph.D., a licensed psychologist, for counseling "to find and or (sic) deal with severe anxiety, crying, vomitting (sic), etc." Plaintiff stated his health conditions were "'in test processing now.'" Plaintiff medicated with Zoloft, Xanax and Ambien (R. 420, 570). Plaintiff reported he lived with his parents. He listed his trauma as a 2007 car accident in which his car was struck on the passenger's side, and gall bladder surgery, during which a clip was left in him. Plaintiff's major interests were houses, cars, and friends. He feared

fires (R. 421, 571). Plaintiff stated he did not experience headaches or breathing problems; his symptoms were dizziness, nausea, diarrhea, and cramps. Plaintiff stated he had no changes in his ability to concentrate, but he experienced changes in his sleep, appetite, weight, energy, motivation, sexual desire, physical health, relationships and fears. Plaintiff felt nervous and/or insecure; he was often bored (R. 422, 572). Plaintiff reported he argued with others, cried, felt as if he would "like to end [his] misery, end [his] life," woke during the night, repeatedly "thinks . . . over and over" in his mind, ate when he was not hungry, was very confused "sometimes," felt "panicked or hyper at times, especially in malls or crowds," and felt that he "sometime" lost periods of time. Plaintiff was not restless, fidgety, defensive, cautious, difficult for others to know, bad tempered, envious, mistrustful, over reactive, withdrawn, shy, delusional, or afraid of counseling. Plaintiff had no difficulty being outgoing, difficulty making or keeping friends, mood swings, nightmares, germ phobia, need to recheck "things," desire to keep things in a particular order, desire to exercise after eating, hallucinations, desire to strike out at people, or desired attention (R. 423-24, 573-74).

Dr. Muir noted Plaintiff liked things orderly, felt cold inside, and felt "body caving in." Plaintiff stated his "spells" manifested themselves in slurred speech and inability to talk. In his "mind, [he would] go to carnival setting." Plaintiff stated he was lonely; his father worked during the night and slept during the day. Plaintiff informed Dr. Muir that he and his parents had a "hard time discussing him (sic) being gay." He had elevated fear and had to sleep with his mother during the previous year. Plaintiff reported he had had an affair with the spouse of a friend, and everyone was "fine w/it now." He had difficulty sleeping; he woke up "scared" and with his "inside churning." Plaintiff reported he had embezzled from his employer in 2002 and "they let him stay on." He then embezzled a second time (R. 428, 576).

Plaintiff's February 23, 2009, CT scan of his brain was negative (R. 393, 615).

On March 9, 2009, Plaintiff presented to Northwood Health Systems that he had "lost his job on 3/5/2009 and [was] experiencing an increase in anxiety and depression . . . ." Plaintiff stated he had "endorse[d] passive suicidal ideations" but denied "any plan or intent to act on these thoughts" (399, 649). He stated that if he "could carry it out[,] he would shoot himself but he ha[d] no gun" (R. 411, 662). He had no homicidal ideations or hallucinations. Plaintiff stated he had increased symptoms of change in appetite, withdrawal, impulsivity, poor judgment, thought blocking, poor concentration, suspiciousness, agitation, and low energy. These symptoms were compounded by financial problems. Plaintiff stated he had experienced "spells of confusion that [were] very brief and accompanied by chills"; he felt these "spells" were aggravated by anxiety (R. 399, 649).

Plaintiff reported he medicated with Zoloft, Xanax, and Ambien. Plaintiff took his medication without assistance. It was noted that the medication Plaintiff took showed "some efficacy but monitoring and/or adjustments may be needed." Plaintiff stated he had no chronic medical problems and was not taking any medications for physical symptoms. Upon examination, Plaintiff was oriented, times four (4); his speech was within normal limits; he appeared disheveled; he had thought blocking; he was withdrawn; and his memory was within normal limits (R. 400, 650). Plaintiff was found to be mildly suicidal. He was moderately withdrawn, impulsive, suspicious, and agitated. His poor judgment, thought blocking, concentration, and energy were moderately severe. Plaintiff's depression, anxiety, and change in appetite were severe. Plaintiff indicated he was "extremely . . . troubled" by psychological or emotional problems and treatment for same was "extremely" important to him. Plaintiff was admitted to the crisis unit "due to increased psychiatric signs and symptoms"(R. 401, 651).

Plaintiff's self-care was mildly impaired. He stated he could maintain adequate personal hygiene and grooming, make and keep necessary appointments, manage his medications, avoid common dangers, and had difficulty walking or "getting around." Plaintiff's activities of community living were mildly impaired. He needed no assistance performing household chores, taking care of possessions, taking care of his living space, handling his personal finances, shopping for food or personal needs, treating minor physical needs, prepare or obtain meals, travel, or obtain assistance in an emergency. Plaintiff needed guidance and/or advice in accessing and using community services. Plaintiff's social, interpersonal and family functioning was mildly impaired. Plaintiff indicated it was somewhat typical for him to respond to other's social contact. It was generally typical for Plaintiff to assert himself effectively and appropriately and to communicate clearly. It was always typical for Plaintiff to ask for help when he needed it, form and maintain a social networks, engage in social and family activities, effectively manage family or interpersonal obligations, and effectively handle conflict with others. Plaintiff's concentration and task performance were moderately impaired. It was somewhat typical for Plaintiff to perform in coordination with or in proximity to others without distraction and maintain attention and concentration spans. It was generally typical for Plaintiff to handle small changes without undue upset. It was always typical for Plaintiff to remember locations and procedures; understand and remember instructions; perform activities within a schedule; maintain attendance and be punctual; sustain an ordinary routine without special supervision; perform at a consistent pace without an unreasonable number or length of rest periods; complete simple tasks without errors; and complete simple tasks without assistance. Plaintiff had moderate limitations in his maladaptive, dangerous and impulsive behaviors. Plaintiff expressed suicide threats daily; however, he never took property

without permission, damaged or destroyed property, set a fire, did physical harm to himself, made suicide attempts, verbally assaulted others, threatened physical harm to others, did physical harm to others, created public disturbances, abused drugs or alcohol, spent time in jail, required use of involuntary mental health services, ran or wandered away, or exhibited sexually inappropriate behavior (R. 405, 655).

Plaintiff was assessed with depressive disorder, NOS, and anxiety disorder, NOS. It was noted that Plaintiff needed substantial assistance with maintaining his personal safety; needed minimal assistance with getting access to other service and health care and with school and work; was independent, with past deficits, in managing his free time; and there was no history as to Plaintiff's ability to maintain his activities of daily living, taking medications, and maintaining adequate housing. The treatment domains were psychiatric symptoms, self-injurious or suicidal, interpersonal relationships, and psychological distress (R. 406, 656).

It was requested that Plaintiff be scheduled for a comprehensive psychiatric evaluation to determine an appropriate diagnosis. It was recommended that Plaintiff participate in crisis stabilization services while an in-patient at Northwood. It was recommended that Plaintiff, upon his discharge from Northwood, take psychiatric medications (R. 407, 657).

It was noted that Plaintiff "[d]ecided to leave . . . because he felt that other clients were much worse off than him (sic), that 'this is not what I need or want,' and was very uncomfortable with sharing sleeping quarters with a stranger. Insisted he will return for outpatient services" (R. 415, 663). Dr. Brady noted Plaintiff required "lower level of care" and to "[d]iscontinue [s]tabilization [s]ervices and observation status because [t]reatment objectives have been met" (R. 410, 666).

Plaintiff received outpatient counseling from Brenda Hart at Norwood on March 16, 2009.

His problem was listed as "anxiety as evidenced by the following data values from the client's current assessment: Mental Status Anxiety acuity rating is Severe." Plaintiff reported he had been "experiencing increased anxiety and panic symptoms for the past two years." Plaintiff stated his "symptoms began in earnest following a medical procedure in which a surgical clip was left inside his stomach" and he had experienced "a litany of physical health problems since that time." Plaintiff reported he had been involved in a "couple of serious car accidents in the past few years." Plaintiff stated he lived with his parents, had lost his job, did not intend to get another job, and was applying for disability benefits. Plaintiff reported he had "overwhelming feelings of doom at times"; became suspicious and frightened, "particularly after dark"; was isolated because he did not leave his home after dark; had some "'spells' in which he [became] disoriented and seem[ed] to lose memory for a few minutes at a time"; and had been evaluated by a neurologist to "determine if he [was] having some seizure activity." Ms. Hart noted that Plaintiff's symptoms negatively impacted Plaintiff's daily functioning, but they were "not currently at crisis level" (R. 417, 667). Plaintiff stated he was disappointed that his outpatient counseling sessions would be thirty (30) minutes and not one (1) hour long and was "uncertain if he wanted to continue services at NHS and [would] phone soon to let [Ms. Hart] know" (R. 418, 668).

On March 17, 2009, Plaintiff participated in counseling with Dr. Muir. Plaintiff reported he "tried Northwood" and he "prefer[red] here." Plaintiff stated Northwood was "not the place for" him; he was not that "bad"; and staying there would make him "worse." Plaintiff had lost his job; he missed the clients. Plaintiff stated he had up to ten (10) seizures per day. They "wipe[d] him out." His "mind work[ed] too much" after the seizure. Plaintiff stated "nobody [would] take the clip out." He was anxious, nervous, scared, and nauseous. Xanax "helped." Plaintiff stated he left his job in

16

Pittsburgh in October, 2007, to have the clip surgically removed and for back surgery, but he did not undergo those procedures. Plaintiff stated he "trie[d] to keep busy – daylight help[ed]." Dr. Muir noted "PTSD - car accident - back [and] clip inside." Dr. Muir found Plaintiff's mood was euthymic, thought process was logical, and behavior/functioning were normal (R. 426, 577).

On March 19, 2009, Dr. Mason noted he was referring Plaintiff to a surgeon to have the metal clip in this abdomen removed and to a physician "for possible petit mal seizures" (R. 419, 605). Dr. Mason noted that Dr. Muir felt Plaintiff had post traumatic stress due to the clip (R. 606).

On March 26, 2009, Plaintiff was evaluated by Monica Smith, Nurse Practitioner ("N.P."). She noted Plaintiff was a "new client to Northwood, referred by primary care physician for evaluation. Client left crisis unit against professional advice on 3/9/09." Plaintiff's chief complaints were anxiety and panic. Plaintiff medicated with 150mg of Zoloft daily; 1mg Xanax four (4) or five (5) daily; 10mg Ambien nightly; and Phenergan as needed. Plaintiff stated he experienced severe anxiety, panic attacks, nausea, vomiting, and "'spells'" in which he slurred his speech, was confused, lost focus, and lost attention. These "spells" occurred "anywhere from one to multiple times a day." Plaintiff reported chest pain "at times." Plaintiff cried daily. Plaintiff had no suicidal intentions or plans. Plaintiff reported he had lost thirty (30) pounds "within the last several months." Plaintiff stated he had difficulty sleeping. He often felt helpless, hopeless, and overwhelmed. He denied mood swings, racing thoughts, and hallucinations. He stated he felt paranoid and claustrophobic last year. Plaintiff stated he "believe[d] these symptoms [were] a result of a severe health issue that he ha[d] been dealing with for several years." He had gallbladder surgery "and never fully recovered from that." He continued to experience nausea, vomiting and gastrointestinal upset. He had been in an automobile accident and injured his back. It was discovered that "there was a hemoclip from

the [gallbladder] surgery retained in his abdomen. He was advised it needed removal as soon as possible but that hasn't been done yet." Subsequent to these events, Plaintiff moved from "Pittsburgh to Moundsville and lost his job related to the economy" (R. 443, 669).

Plaintiff reported he completed twelve (12) years of high school, but did not graduate because he was one (1) credit short. Plaintiff reported he managed a salon until "several weeks ago." Upon mental status examination, N.P. Smith noted Plaintiff was slightly obese, was of medium frame, carried a men's handbag, wore multiple pieces of jewelry, was "somewhat flamboyant," and appeared younger than his stated age. Plaintiff was alert and oriented, he maintained good eye contact, his speech was clear and coherent, his answers to questions were thorough and rational, he was not reserved or guarded, he was polite and cooperative. N.P. Smith diagnosed generalized anxiety disorder; his GAF was fifty (50). N.P. Smith discontinued Zoloft and started Plaintiff on Cymbalta and "consider[ed] adding BuSpar" (R. 444, 670).

On March 30, 2009, Plaintiff presented to N.P. Smith for a "walk-in appointment." Plaintiff reported he had difficulty falling and staying asleep. He felt depressed and anxious; he cried daily; he was agitated and had obsessive thoughts. Plaintiff stated he experienced "severe [side effects] from Cymbalta." Upon examination, Plaintiff was cooperative, had normal activity level, had rapid speech, had normal affect, was oriented as to person, place and time, had no hallucinations, and was not a danger to himself or others. N.P. Smith assessed depression and anxiety. She discontinued Plaintiff's prescription for Cymbalta and prescribed Paxil (R. 445, 671).

Plaintiff reported to Dr. Muir on April 2, 2009, for counseling. He stated Cymbalta made him ill; he was going to begin medicating with Paxil on April 3, but he was "scared" about that. He stated he was "holding up." He cried every day. He did not have "much to occupy [his] time." He

stated he did not leave his home two (2) days during the previous week and that was "not like" him. His "issues" were balance, vertigo, dizziness and nausea. Plaintiff stated he had been involved in a car accident when he was sixteen (16) years old when a friend was driving; a car accident when he was sixteen (16) or seventeen (17) and a drunk driver collided with his car; a car accident when he was twenty-eight (28) years old and was sideswiped; a car accident when he was twenty-eight (28) years old and hit a deer; and a car accident in 2007, when he was hit from the rear and "pinned by a Mack truck." Plaintiff reiterated he had a surgical clip that remained, post gallbladder surgery. Plaintiff stated he was "getting nowhere [with his] physical issues. Dr. Mason trying . . . to get the clip removed. No response yet." Dr. Muir found Plaintiff's mood was euthymic; his thought process was logical; and his behavior and functioning were normal (R. 425, 578).

On April 6, 2009, Plaintiff returned for treatment with N.P. Smith. He stated he felt depressed, anxious, and nauseated. Plaintiff stated he had had a crying spell. He was cooperative. His activity level and speech were normal. He "appear[ed] in good spirits . . . ." He was instructed to continue current medications (R. 446, 672).

On April 8, 2009, Plaintiff participated in counseling with Dr. Muir. He reported he was still crying and more agitated. Plaintiff stated Paxil did not make him ill. Plaintiff reported his "mind [didn't] stop." He was afraid to be on the highway; he vomited for "no reason"; he waited for "something bad to happen." Plaintiff stated he took on the "burdens of others and that his mother's "unhappiness" bothered him. Plaintiff stated the surgical clip could cause him to die, could cut his colon, or could cause him to bleed to death. Dr. Muir noted Plaintiff was sad and fearful; his thought process was racing; and his behavior and functioning was normal (R. 579).

On April 14, 2009, Plaintiff met with N.P. Smith for medication management. Plaintiff

reported he was sleeping well; he felt depressed and anxious.  Plaintiff stated he was "experiencing some positive signs from Paxil," such as fewer crying spells and feeling less anxious.  He was "getting out" and felt "verbally aggressive at times."  Plaintiff reported he was "taking less Xanax."  Plaintiff was cooperative; well groomed; had normal activity level and speech; oriented as to person, place and time; had no hallucinations; and he was in "good spirits."  N.P. Smith continued Plaintiff's prescription for Paxil (R. 447, 673).

Plaintiff participated in a counseling session with Dr. Muir on April 16, 2009.  He reported he took three (3) Xanax per day; he had started taking Paxil at night and thought it "may help with sleep."  He was crying less and was less anxious.  Plaintiff talked about his fear about his parents' deaths, especially "since the clip."  Dr. Muir found Plaintiff's mood was sad and euthymic, his thought process was logical, and his behavior was normal (R. 580).

An April 17, 2009, office note from Dr. Mason reads that neither Dr. Cross, a surgeon, nor Dr. Saracco, a surgeon, would "see" Plaintiff relative to the metal clip (R. 605).

On April 17, 2009, Karl G. Hursey, a state-agency psychologist, completed a Psychiatric Review Technique of Plaintiff.  He stated Plaintiff had affective and anxiety-related disorders (R. 429).  Mr. Hursey found Plaintiff had mild limitations in his activities of daily living, ability to maintain social functioning, and with concentration, persistence and pace (R. 439).

Plaintiff reported to N.P. Smith on April 21, 2009, for medication management.  He reported difficulty falling and staying asleep.  He felt anxious, he worried, he had crying spells, he had "small improvements" in his mood and irritability.  Plaintiff was cooperative, well groomed, and oriented, times three (3).  Plaintiff's activity level and speech were normal.  He was in good spirts.  N.P. Smith noted Plaintiff's "right hand tremoring and [Plaintiff] silent/staring.  Lasted approx. 30-45 seconds

before responding." N.P. Smith noted Plaintiff may have a "need for evaluation for poss seizure d/o." She increased Plaintiff's dosage of Paxil (R. 448, 674`).

On April 23, 2009, Plaintiff participated in counseling with Dr. Muir. Plaintiff reported he was doing poorly. He "cried all morning." He felt "icky, uncomfortable, "nauseated," and off balance." Plaintiff reported he had had a "lot of spells." He had one (1) when he was with his insurance agent, one at Northwood, and one with his niece. He said he had distorted thoughts, his right hand shook, he stared, and he could not "get [his] words out." Plaintiff stated he was physically exhausted. He felt like a "loser." He had no support from his family or "medical field." He felt unworthy and bitter. Dr. Muir found Plaintiff was sad and angry, his thought process was logical, his behavior and functioning were normal, and he was not a danger to himself or others (R. 581).

On April 24, 2009, Mr. Hursey completed a Physical Residual Functional Capacity Assessment of Plaintiff. Mr. Hursey found Plaintiff could occasionally lift and/or carry twenty (20) pounds; frequently lift and/or carry ten (10) pounds; stand and/or walk for a total of about six (6) hours in an eight (8) hour workday; sit for a total of about six (6) hours in an eight (8) hour workday; and push/pull unlimited (R. 450). Mr. Hursey found Plaintiff could never climb ladders, ropes, or scaffolds. He could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl (R. 451). Plaintiff had no manipulative, visual or communicative limitations (R. 452-53). Mr. Hursey found Plaintiff should avoid concentrated exposure to extreme cold and heat and should avoid all exposure to hazards. Mr. Hursey found Plaintiff was unlimited as to his exposure to wetness, humidity, noise, vibration, fumes, odors, dusts, gases, and poor ventilation (R. 453). Mr. Hursey relied on an insurance agent's and nurse practitioner's accounts of Plaintiff 's seizure-like behavior (R. 456). Mr. Hursey noted he had "reviewed the MER and the decision of 4/17/2009 is

affirmed as written. [Plaintiff] sought tx at Northwood, doing well, 'good spirits'" (R. 457).

Dr. Mason noted, on April 30, 2009, that his "plan" for Plaintiff was to "still . . . work on getting the clip out because, again, I think, from a psychological standpoint and maybe even from a toxic standpoint, it is causing his duress and anxiety." Dr. Mason noted he was going to "try to get him a surgeon to take the clip out" (R. 604).

On May 4, 2009, N.P. Smith met with Plaintiff for medication management. Plaintiff stated he had difficulty falling and staying asleep. His energy level was normal. He felt depressed, anxious, hopeless, worthless, "bitter about health problems," and "icky and gross." Plaintiff stated his "spells" had been more frequent. He was cooperative; his speech was rambling; his affect was blunted; his activity level was normal; and he was oriented, times three (3). N.P. Smith found there had been no improvement in Plaintiff's symptoms and continued his medications (R. 675).

Plaintiff participated in counseling on May 7, 2009, with Dr. Muir. He stated his application for Social Security benefits had been denied again. He could find no lawyer to "take this up." He could find no doctor to remove the abdominal clip. His primary care physician was referring him for additional seizure monitoring. He vomited and cried daily. He became angry and dreaded each day. Xanax was the "only" thing that kept him from vomiting. Dr. Muir found Plaintiff was angry and fearful; his thought process was logical; his behavior and functioning were normal (R. 582).

On May 12, 2009, Plaintiff presented to Dr. Corder for medication management. Plaintiff reported his appetite was good; he was depressed and anxious; he took three (3) to five (5) Xanax per day; he was frequently nauseated and he frequently vomited; felt more irritable; and he "'thought he was suicidal' but has decided that [was] not an option." Dr. Corder found Plaintiff was cooperative; his attitude was pleasant; he was well groomed; he fidgeted; he had no abnormal

psychomotor activity; his speech was rapid, but fluent and focused; he had full range affect, it was stable, but was not appropriate to content; he had no psychosis; he was not a danger to himself or others; and he was "[f]airly bright with mismatched extreme difficulties reported." Dr. Corder increased Plaintiff's dosage of Paxil (R. 676).

On May 15, 2009, Plaintiff was evaluated by Dr. Raves for a surgical clip in his abdomen. Plaintiff reported the clip was from a 2002 cholecystectomy and had been discovered when he had an x-ray taken after a 2007 automobile accident. Dr. Raves noted Plaintiff had had "some chronic abdominal complaints but those haven't been worked up or followed . . . [he had] never seen a gastroenterologist . . . ." Dr. Raves reviewed Plaintiff's CT scan and pelvis x-tray, which showed "a closed clip in the left gutter." Dr. Raves noted he thought "part of the issue is that [Plaintiff ] had problems in terms of anxiety and panic attacks and had been told a whole host of different stories about the clip[] that [was] in his abdomen." Upon examination, Dr. Raves noted Plaintiff's abdomen was soft, obese and completely non-tender. Dr. Raves informed Plaintiff that the "clip[] [was] totally inert" and that "clips, particularly from gallbladder surgery, migrate all the time." He "reassured" Plaintiff that the clip should not be removed and that "blindly going after a clip in the pelvis just because it is there and is worrisome [was] not an indication for removing it." Dr. Raves felt that successfully locating and removing the clip was "like finding a needle in a haystack," he would not perform the surgery and he would "strongly recommend" that it not be surgically removed. Dr. Raves stated he had "put in tens of thousands" of the clips during his career as a surgeon and had "never seen a problem" with them. Dr. Raves informed Plaintiff that he was not allergic to the clip and the clip would not prevent him from having a MRI (R. 645-46).

Plaintiff underwent counseling with N.P. Smith on May 26, 2009. Plaintiff reported he was

23

having "no difficulties." Plaintiff was sleeping well, felt depressed and anxious, was not vomiting, had crying "spells," felt "'icky' and uncomfortable," and was "getting out." Plaintiff stated he continued to have "episodes of slurred speech and seizure-like behavior." Plaintiff was cooperative, his activity level was normal, his speech was focused, and he was in "good spirits." Plaintiff was oriented, times three (3). N.P. Smith increased Plaintiff's dosage of Paxil (R. 677).

On May 28, 2009, Plaintiff participated in counseling with Dr. Muir. Plaintiff reported he had located an attorney to pursue a Social Security claim on his behalf. He "need[ed] another CAT scan of back for the lawyer." He was evaluated by two doctors who refused to remove the surgical clip from his abdomen. He stated he would "probably" have to "come to terms [with] it being in [him] for the rest of his life." Plaintiff continued to be nauseated, vomit and cry. Xanax "help[ed]." He felt rejected in "every arena." He was still dealing with "mom issues." He stated he experienced claustrophobia "since the accident." He awoke some nights "waiting for something bad to happen." He stated he felt the "clip [was] 60% of his issues." Dr. Muir found Plaintiff was "a bit" labile; his thought process was logical; and his behavior and functioning were normal (R. 583).

Plaintiff participated in counseling with Dr. Muir on June 11, 2009. He stated that Paxil was not effective. He stated he was not doing well, like he was "going crazy," and as if he was "losing" his mind. Plaintiff stated he got "scared"; he cried; he had more frequent "spells." He had a "small spell in session" and he felt "weird" afterwards. Dr. Muir found Plaintiff was stressed; his thought process was logical; his behavior and functioning was normal; and he had suicidal ideations (R. 584).

On June 12, 2009, Dr. Mason wrote a letter relative to Plaintiff. He wrote Plaintiff had been under his care since 2007 and his "health issues . . . made it impossible for him to maintain any type of employment." Dr. Mason noted that Plaintiff had a surgical clip in the "left mid line/mid-pelvic

24

area," which remained from a 2002 surgery. He wrote that "[m]ultiple surgical consults and a urology consult were obtained. No recommendation of surgical removal was made due to potential complications." Dr. Mason wrote that Plaintiff had been under "extreme stress," and had "new onset of panic attacks, claustrophobia and suicidal ideation." Dr. Mason noted Plaintiff had "had very poor response to medications and psychological counseling" and had experienced a "significant change in cognitive states relating to short term memory loss." Dr. Mason opined that Plaintiff had PTSD. He noted that Plaintiff was unable to sustain employment because of the unpredictability of the panic attacks and his poor response to treatment (R. 458, 648).

Plaintiff presented to the emergency department of Wheeling Hospital on June 19, 2009, for seizures. Plaintiff stated he had experienced "intermittent seizure like episodes several times a day for 3 years." Plaintiff described his symptoms as becoming chilled, feeling like he is going to have a bowel movement, becoming confused, slurring speech, and right-hand tremors. Plaintiff stated he was able to recall the episodes and they last between fifteen (15) seconds to one (1) minute. Plaintiff reported he had two (2) to ten (10) episodes per day (R. 620-21). Plaintiff reported he experienced drowsiness, weakness and numbness. Plaintiff stated he had headaches and had experienced a recent head injury. Plaintiff stated he had lost thirty-six (36) pounds in eight (8) weeks. Plaintiff reported he had anxiety, palpitations, and chest pain. He had a skin rash and itched. He had neck pain. Plaintiff reported he was depressed and he medicated with Xanax, Ambien, Phenergan, and Paxil (R. 621). Dr. Tellers administered an EEG. It was normal (R. 622).

Plaintiff's June 19, 2009, CT scan of his brain was normal. It was noted that a MRI scan could "be helpful for further evaluation of a possible seizure disorder" (R. 614).

Plaintiff reported for medication management to N.P. Smith on June 23, 2009. He reported

he had difficulty falling and staying asleep; felt depressed and anxious; was nervous; cried; had low energy and motivation; was nauseous and he vomited; felt "'gross'" and "'uncomfortable'" on the inside; and felt hopeless. Plaintiff was cooperative, was oriented, had normal activity level, had fluent and focused speech, and had normal affect. N.P. Smith prescribed Paxil and noted Plaintiff's primary care physician had prescribed Xanax, Ambien, and Phenergan (R. 678).

On June 26, 2009, Dr. Mason referred Plaintiff for a neurologic evaluation and found Xanax and Paxil "seemed" to help Plaintiff's "symptoms a little bit better"(R. 604).

Plaintiff presented to N.P. Smith on July 14, 2009, for medication management. Plaintiff reported he had difficulty falling and staying asleep, felt depressed and anxious, cried all the time, felt "'icky,'" and had no improvement in his mood. He used Xanax to "keep him from 'vomiting' from the anxiety." Plaintiff stated he was worried and upset about the future and he would always feel that way. Plaintiff's activity level was normal; his speech was fluent and focused; his affect was tearful; he was oriented, times three (3). N.P. Smith prescribed Paxil, Deplin and Pristiq (R. 685).

Plaintiff engaged in counseling with Dr. Muir on July 15, 2009. He stated he was taking Pristiq and Xanax. He stated that none of the depression medications helped alleviate his symptoms. He stated Ambien was "not working." He cried; woke up "afraid"; was "too nervous to do things"; "quiver[ed] inside"; did not go anywhere; continued to have "spells"; was nauseated; and went to Walmart and "tremble[d] and tear[ed] up." Plaintiff stated he could not work; he was in debt; the "clip kill[ed]" him; he felt "empty." Dr. Muir found Plaintiff was sad and fearful; his thought process was logical; and his behavior and functioning were normal (R. 585).

On July 27, 2009, Dr. Mason found a mole on Plaintiff's right shoulder; he thought it was a "blue nevus"; he referred Plaintiff for a dermatological evaluation (R. 602). Plaintiff reported

Ambien was not as effective as it had been. He medicated with Xanax, Pristiq and Ambien (R. 703).

Plaintiff presented to N.P. Smith on July 28, 2009, for medication management. Plaintiff reported he had difficulty falling and staying asleep. He was depressed and anxious. Plaintiff stated he had no "problems with medications." Plaintiff stated he had had a few good days. Plaintiff's activity level and speech were normal. He was oriented, times three (3). N.P. Smith found Plaintiff had no acute symptoms, prescribed Pristiq and Deplin, and noted Plaintiff's primary care physician prescribed Xanax, Phenergan, and Ambien (R. 686).

Plaintiff participated in counseling with Dr. Muir on July 30, 2009. Plaintiff stated he was having fewer "spells." He was anxious, paranoid, nervous, and uncomfortable. Plaintiff reported that "doc said PTSD from the clip, etc." He stated that "[o]verall, Pristiq [may be] helping – having some good days." He had headaches, and he had been involved in two (2) motor vehicle accidents in the past. Dr. Muir found Plaintiff was euthymic; his thought process was logical; and his behavior and functioning were described as hyperactive because his feet were "constantly moving" (R. 586).

On August 11, 2009, Plaintiff reported to N.P. Smith for medication management. Plaintiff reported he was not sleeping well. His energy level was normal. He felt depressed and anxious. He was not having "problems with medications." He reported "some positive changes . . . had a fairly decent 2 weeks." Plaintiff stated that "spells" and nausea had "returned." Plaintiff stated he had been "doing more and getting around." Plaintiff's activity level and speech were normal. He was in "good spirits" and stable. He was oriented, times three (3). N.P. Smith prescribed Pristiq and Deplin and noted Plaintiff's primary care physician prescribed Xanax, Phenergan, and Ambien (R. 687).

Plaintiff was evaluated by Dr. Torres-Trejo on August 17, 2009, for episodes of confusion. Plaintiff described his episodes as his experiencing a cool sensation, feeling as if he were going to

have a bowel movement, getting a "little bit sort of confused," slurring his speech, mumbling, saying "things that [were] not concordant with the situation," and right hand tremors. Plaintiff reported as few as two (2) and as many as twelve (12) "spells" a day. Plaintiff reported he was experiencing stress, he had a surgical clip in his abdomen, and he had had a motor vehicle accident. Plaintiff reported he had not been diagnosed with any serious illnesses; his gallbladder had been removed in 2002 (r. 641). Plaintiff informed Dr. Torres-Trejo that he medicated with Ambien, Phenergan, Xanax, and Pristiq (R. 641-42). Plaintiff reported he had lost thirty (30) pounds in the past six (6) weeks; he had blurry vision; his heart raced when he got anxious; he had "some" nausea; he had chronic low back pain from herniated disks; and he had anxiety. Dr. Torres-Trejo ordered tests at the Epilepsy Monitoring Unit; instructed Plaintiff to receive treatment from his primary care physician for his anxiety; and told Plaintiff not to operate a motor vehicle (R. 642).

Dr. Torres-Trejo reviewed Plaintiff's February 23, 2009, and June 19, 2009, head CT scans and noted "abnormalities located in the posterior aspects of the lateral ventricles in the form of nodules lying along the ependyma of the lateral ventricles bilaterally. . . . These nodules may represent heterotopia or tuberous sclerosis." Dr. Torres-Trejo reviewed Plaintiff's September 19, 2007, lumber spine CT scan, which showed spinal canal narrowing at L3-4; grade 1 spondylolisthesis at L5 onto S1; right lateral herniated disc at L5-S1, which was beginning to compress the nerve root. Dr. Torres-Trejo reviewed Plaintiff's September 19, 2009, CT scan of his pelvis and abdomen and noted it showed "mild fatty metamorphosis to the liver" and increased density on the left side of his pelvis. Dr. Torres-Trejo ordered a MRI of Plaintiff's brain (R. 643).

On August 19, 2009, Plaintiff reported to Dr. Mason that he was going to be evaluated by Dr. Torres and may have to be hospitalized for up to one (1) week. Dr. Mason found Plaintiff had

stress-induced anorexia.  He ordered a gastrointestinal "workup" and a CT scan of his abdomen, pelvis, and lumbar region relative to an automobile accident (R. 601).  He noted Plaintiff "still [had] insomnia."  He medicated with Ambien, Xanax, and Restoril  (R. 602, 740).

Plaintiff engaged in counseling with Dr. Muir on August 21, 2009.  He stated he was having a "[d]ecent day" and he had not had a "spell."  He had been busy "helping a friend."  Plaintiff stated he continued to have "spells" daily and they took "so much out of" him.  Plaintiff stated he had had headaches for years. He cried "all the time."  Dr. Muir found Plaintiff was euthymic; his thought process was logical; and his behavior and functioning were normal (R. 587).

Plaintiff participated in counseling with Dr. Muir on August 28, 2009.  He stated he had not cried in a "few days"; he traveled to Columbus and stayed there for two (2) days; the trip went "very well"; he went places by himself; he went out with a friend; he slept better in the hotel than he did in his home; he had only one (1) small spell.  Dr. Muir found Plaintiff was euthymic; his thought process was logical; and his behavior and functioning was normal (R. 588).

On September 1, 2009, Plaintiff presented to N.P. Smith for medication management.  He reported he had difficulty falling and staying asleep.  Plaintiff reported he was "'no better/no worse.'"  He informed N.P. Smith that he had traveled to Columbus the previous week to visit friends; he was "able to do things, drive and go out w/friend" because he was "getting out more."  Plaintiff reported he still felt nervous and cried, but less so in the past few weeks.  Plaintiff's affect, activity, and speech were normal; he was oriented, times three (3).  N.P. Smith found Plaintiff had no acute symptoms.  She prescribed Pristiq and Deplin and noted Plaintiff's primary care physician prescribed Xanax, Phenergan, and Ambien (R. 688).

Plaintiff engaged in an emergency counseling session with Dr. Muir on September 8, 2009.

29

He stated he "wanted to sleep all day" due to Restoril. He stated he had been "horrible since he was here last." He could not stop crying and he trembled. He had "so many seizures . . . before he stopped the Restoril"; he had seizures while he drove a car. He woke up nightly and worried about how awful he felt, was afraid of his own home, had no interest in "usual things," was queasy, was nauseous, and felt dread "all the time." Plaintiff stated he did not want to lose his driver's license because that was his "freedom." Plaintiff reported he had called an epilepsy foundation and had asked questions. Dr. Muir found Plaintiff's mood was sad; he was crying and his voice was trembling; his thought process was logical; his behavior and functioning were agitated (R. 589).

On September 11, 2009, Physician Assistant ("PA-C") Potts examined Plaintiff relative to nausea, abdominal pain and diarrhea. Plaintiff reported he had experienced these symptoms since he had his gallbladder removed. PA-C Potts diagnosed diarrhea and abdominal pain. He ordered a TSH test, CBC, stool study, esophagogastroduodenoscopy ("EGD"), and colonoscopy and prescribed Nexium (R. 543, 629).

Plaintiff's September 11, 2009, H. pylori breath test was positive for dyspepsia; test for celiac disease was negative; TSH test was normal; and blood work results were normal (R. 550-55).

Plaintiff presented to N.P. Smith on September 15, 2009, for medication management. Plaintiff reported he had difficulty falling and staying asleep. He was anxious. He had good and bad days. Plaintiff stated that, on "good days," he was active, energetic and felt "like [his] old self." On bad days, he "normally" had "'episode' occurring as previously documented," anxiety, "high" depression, not wanting to go anywhere or do anything, and felt "bad." Plaintiff had no "problems" with medication. His activity level, speech, and affect were normal. He was oriented, times three (3). N.P. Smith found Plaintiff was "maintaining baseline." She prescribed Pristiq and Deplin and

noted Plaintiff's primary care physician prescribed Ambien, Xanax, and Phenergan (R. 689).

Plaintiff participated in counseling with Dr. Muir on September 16, 2009. He medicated with Restoril, Phenergan, Nexium, Pristiq, and Xanax. Ambien "seemed to make anxiety worse." Plaintiff stated he was different when he did not have "spells." When he was having a good day, he had mild spells and was "close to what [he] used to be like." Dr. Muir found Plaintiff was euthymic; his though process was logical; and his behavior and functioning were normal. Dr. Muir discussed visual issues, such as color and prisms, relative to head trauma with Plaintiff (R. 590).

The blue nevus was removed from Plaintiff's shoulder on September 16, 2009 (R. 630).

Plaintiff was admitted to Ruby Memorial Hospital on September 18, 2009, for EEG monitoring (R. 459, 487). Plaintiff reported his behavior was "initially . . . interrupted with pauses in his speech and/or thought pattern." Plaintiff reported that his current symptoms included "slurred speech/gibberish, maybe changing topic or conversation," right hand trembling, and cooling sensation. Plaintiff stated he experienced these symptoms "from a couple per day to 10 to 12 spells daily." Plaintiff stated the last occurrence was four (4) days earlier (R. 487).

According to Dr. Torres-Trejo, Plaintiff's September 18 and 19, 2009, EEGs showed "substantial diffuse beta activity that may be medication related and substantial muscle artifact bifrontaly that may obscure potential abnormalities. No definite epileptiform discharges were seen." Plaintiff had substantial snoring and apneas (R. 462-64).

According to Dr. Torres-Trejo, Plaintiff's September 20, 2009, EEG showed the following:

1.    Substantial beta activity, most likely medication related.

2.    Substantial muscle artifact in the frontal area that may obscure potential abnormalities.

3.    Substantial snoring and apneas that suggests obstructive sleep apnea.

31

4.      The [Plaintiff] pressed the button twice. One event happened while the [Plaintiff] was in the bathroom. On the second event[,] the [Plaintiff] appeared to be confused and the EEG shows some changes in rhythm in the form of what appears to be delta activity, better seen on the left side of the head, but this is confounded by the fact that there is substantial frontal muscle artifact.

Because of the changes in rhythm and morphology in the EEG[] and also the clinical event suggest that this is an ictal event (R. 465-66).

Dr. Torres-Trejo also found it was "important to note that the [Plaintiff] was taking up to 5 mg of Xanax a day (R. 465).

According to Dr. Torres-Trejo, Plaintiff's September 21, 2009, EEG showed the following:

1.      Substantial beta activity, most likely medication related.

2.      Substantial muscle artifact in the frontal area that may obscure potential abnormalities.

3.      Substantial snoring and apneas that suggests obstructive sleep apnea.

4.      The [Plaintiff] had a clinical event. At this time the only clinical manifestation was his right hand with sort of automatic movements but no other clinical manifestations that were obvious via the video. However, on the EEG there was a clear change in rhythm on the left hemisphere that began initially at T1 electrode then involved the left hemisphere in the form of delta activity with broad-based sharp waves morphology. These EEG changes suggest that the seizure probably arise from he (sic) left temporal area. The above clinical event and the EEG changes is (sic) compatible with an ictal event. Clinical correlation is advised (R. 468-69).

Plaintiff was discharged on September 21, 2009, from Ruby Memorial Hospital. Dr. Medeiros, a neurology resident, completed the discharge summary; Dr. Torres-Trejo noted he evaluated Plaintiff, reviewed the summary of Dr. Medeiros, and agreed with the findings and plan of care as documented by Dr. Medeiros (R. 470-72). Dr. Medeiros diagnosed Plaintiff with seizure disorder, anxiety, and depression. Plaintiff was prescribed Lamictal, a seizure medication, Xanax, Phenergan, Nexium, and Pristiq. Plaintiff was instructed to return for treatment by Dr. Torres-Trejo

in five (5) weeks.. He was instructed that he should participate in activities "as tolerated"; however, Plaintiff was informed he should not drive, swim, or bathe alone. Plaintiff was informed he should avoid heights and using dangerous machinery (R. 470, 631, 634).

Dr. Mehta performed a EGD on Plaintiff on September 24, 2009. It showed a small hiatal hernia and gastritis. Dr. Mehtra recommended Plaintiff have a follow-up biopsy of his "stomach from the H. pylori staining." Dr. Mehtra found Plaintiff should "be on proton pump inhibitor" and should "follow anti-reflux (sic) measures" (R. 546-47, 637-38).

Plaintiff's September 25, 2009, colonoscopy showed hemorrhoids and "fair to poor preparation." The colon biopsy showed "reactive colonic mucosa with focal lymphoid aggregate" but were "not diagnostic for microscopic . . . colites." The stomach biopsy showed "findings consistent with reactive gastropathy." Dr. Mehta found Plaintiff should undergo a follow-up examination of the ascending colon and follow a high fiber diet (R. 548-49, 616, 618, 639-40).

Plaintiff presented to N.P. Smith on October 6, 2009, for medication management. N.P. Smith noted Plaintiff had normal activity level, speech, and affect. He was oriented, times three (3), and cooperative. Plaintiff reported he had "no difficulties today." He felt anxious and denied any symptoms of mania. Plaintiff reported to N.P. Smith that he had started medicating with Lamictal for seizure treatment. Plaintiff stated his day was "fine" if he did not a "'spell'"; however, he experienced anxiety, nausea, vomiting, paranoia when he did have a "spell." Plaintiff reported that, on good days, he got "out, [was] sociable and less anxious." N.P. Smith found Plaintiff was "maintaining baseline." She prescribed Pristiq and Deplin and noted Plaintiff also medicated with Ambien, Xanax, Phenergan and Lamictal (R. 690).

On October 19, 2009, Plaintiff participated in counseling with Dr. Muir. He stated he was

having fewer spells. He still cried "all the time." He felt afraid. He had no hope for the future. He felt nothing made him happy. He said the atmosphere at his house made things worse. He stated that a "few" of his friends had stopped talking to him. He said his mother had said she may be getting her own apartment. He said that if he were "spell" free, he could "pretty much deal [with] what came." Dr. Muir found Plaintiff was euthymic and sad; his thought process was logical; his behavior was normal; he had passive ideations about harming himself (R. 591).

Physician Assistant Potts corresponded with Dr. Mason on October 26, 2009, about Plaintiff's EGD, which showed gastritis and hiatal hernia, and colonoscopy, which showed hemorrhoids. PA-C Potts informed Dr. Mason that the biopsies, lab work, and stool studies were all "unremarkable." PA-C Potts noted that Plaintiff's diarrhea and nausea could "most likely" be caused by irritable bowel syndrome. PA-C Potts wrote that he had given Plaintiff "the options of treatment of medication," but Plaintiff preferred "not to have any medicines at this time" (R. 628).

Plaintiff was examined by PA-C Potts on October 27, 2009, for diarrhea and frequent bowel movements. Plaintiff's symptoms were unchanged from September 11, 2009. He was diagnosed with gastritis with hernia and hemorrhoids. Plaintiff was instructed to increase fiber. Plaintiff informed PA-C Potts that he did not want further work ups or tests at the present time (R. 542).

Plaintiff attended counseling with Dr. Muir on November 2, 2009. He stated the severity of the "spells had lessened." He had had seven (7) days without any "spells." Plaintiff stated he felt "somewhat better . . . overall." He had been going out, socially. He cried less. He said he was "everyone's best friend[] & so funny." Dr. Muir made no findings (R. 592).

Dr. Torres-Trejo wrote to Dr. Mason on November 9, 2009, relative to Plaintiff's follow up examination on that date. Dr. Torres-Trejo informed Dr. Mason that Plaintiff reported that "his

spells [were] less frequent and also the severity of the spells [was] significantly changed and they [were] much milder at this point." Plaintiff tolerated Lamictal well and without complication. Plaintiff stated that he had "an average of one spell a day, but prior to medication, he had more than 10 spells a day." Dr. Torres-Trejo found Plaintiff's neurological examination was unremarkable. Dr. Torres-Trejo diagnosed "seizure, most likely partial seizure" (R. 625-26). Dr. Torres-Trejo increased Plaintiff's dosage of Lamictal, scheduled an open MRI of Plaintiff's brain, and ordered a sleep study. Dr. Torres-Trejo instructed Plaintiff to refrain from driving and to contact the "motor vehicle department for them to tell him his driving privileges" (R. 626).

On November 10, 2009, Plaintiff presented to N.P. Smith for medication management. Plaintiff stated he had been sleeping well; he was depressed; he felt anxious. He reported "basically no change." Plaintiff was still having "'episodes' - shorter and less intense." Plaintiff stated he was uncertain whether the psychoactive drugs were "helpful"; however, he stated he had no problems with medications. N. P. Smith found Plaintiff was cooperative; his activity level and speech were normal; he was oriented, times three (3); he had no hallucinations; he was in "good spirits." N.P. Smith found Plaintiff was "maintaining baseline." She prescribed Pristiq and Deplin and noted Plaintiff also medicated with Lamictal, Ambien, Xanax, and Phenergan (R. 691).

Plaintiff participated in counseling with Dr. Muir on November 16, 2009. Plaintiff stated he had fewer and milder "spells." He said he had good and bad days, which were related to the "spells." Plaintiff stated he had "learned to handle 'regular' daily" anxiety. Plaintiff stated he had cried and had a "lot of emotion." A person for whom he felt affection had a boyfriend. Plaintiff said he was "getting to the point" where he wanted to be with "someone & finish [his] life." His parents told him they did not want him to move out of the house. Plaintiff stated his family was not able to "support"

him, and that "really hurt." Plaintiff stated his father's "funds [were] really low." He felt he was part of the reason for that, and he felt bad. Plaintiff stated all he wanted was to be "loved, not used & not blamed.' Dr. Muir found Plaintiff was sad, angry, stressed, labile; had racing thoughts; and had agitated behavior and functioning (R. 593).

Plaintiff underwent a polysomnography all-night study on November 24, 2009. Dr. Palade found Plaintiff had severe obstructive sleep apnea "during the first portion of the night, after which the BiPAP was used and eliminated most of the patient's recurrent respiratory events and improved sleep continuity" (R. 561).

Plaintiff was counseled by Dr. Muir on December 1, 2009. Plaintiff reported he had one (1) to three (3) "spells" daily; some were "dramatic" and some were mild. He forced himself to leave the house. He thought Lamictal "helped" his mood "a bit." He was trying to lose weight. Plaintiff had gone "out" for the past two (2) weekends. He had applied to work at Oglebay Village Apartments. Plaintiff's friend had stopped communicating with him, which made him cry, but he was "dealing" with it. Dr. Muir found Plaintiff was euthymic, had logical thought process, and had normal behavior and functioning (R. 594).

On December 8, 2009, Plaintiff met with N.P. Smith and Dr. Corder relative to medication management. Plaintiff stated he had difficulty falling and staying asleep; he was not irritable or agitated; and he felt depressed and anxious. Plaintiff had no "problems" with medication. Plaintiff still experienced episodes of crying. He was not suicidal. N.P. Smith and Dr. Corder observed Plaintiff was cooperative, in "good spirits," and was oriented, times three (3). Plaintiff's activity level and speech were normal. He had no psychosis. N. P. Smith and Dr. Corder found Plaintiff was "maintaining baseline." Plaintiff was prescribed Pristiq (R. 692).

Plaintiff engaged in counseling with Dr. Muir on December 10, 2009. He was "trying to reduce" his dosage of Xanax. Plaintiff reported he continued to have "spells." He attempted to stay busy. His financial situation was "getting harder & harder." A friend stopped responding to his e-mails. He was hurt and angry that another person ended a relationship with him. His mother was "clearly not understanding/accepting gay relationship" and what he wanted. Dr. Muir found Plaintiff was euthymic; his thought process was logical; his behavior and functioning were normal (R. 595).

Plaintiff was prescribed a CPAP machine by Dr. Palade on December 23, 2009 (R. 560).

Plaintiff participated in counseling with Dr. Muir on January 4, 2010. He stated the seizure medication was "really helping to stabilize" him. Plaintiff still cried at times. He reported he had had "some spells," panic attacks and increased anxiety. He tried to "stay busy." Plaintiff reported he had experienced troubling dreams. Plaintiff stated he could not discuss issues with his family. He had "bad issues" with his stomach and had lost thirty (30) pounds. Dr. Muir found Plaintiff was euthymic, had logical thought process, and had normal behavior and function (R. 596).

Plaintiff stated, on January 17, 2010, that he had attempted to "use his Bipap nightly, but ha[d] trouble staying asleep" due to nightmares. Plaintiff reported the mask fit, he used it at night, he realized relief from morning headaches from it, and he had stopped snoring (R. 726).

On January 19, 2010, Plaintiff participated in counseling with Dr. Muir. Plaintiff stated he had a friend who had been hospitalized and he had been collecting the friend's mail. Plaintiff reported he had been hospitalized for a "rare infection, internal thing." Plaintiff was treated with intravenous antibiotics, which caused his arm to "swell." He was prescribed pain medication and released. He felt his "spells" were stress related. He was "still fighting taking the Xanax." He was anxious and nauseated. Plaintiff reported he had used the CPAP machine and was afraid of it. He

was afraid to go to sleep. He experienced burning in his hip from "walking so much" (R. 597).

On January 26, 2010, Plaintiff met with N.P. Smith and Dr. Corder relative to medication management. Plaintiff stated he had difficulty falling and staying asleep. He felt anxious; he had been in a "slump" for the past two (2) weeks; he had "high stress." Plaintiff was not irritable or agitated. Plaintiff was cooperative; his activity level and speech were normal; his affect was blunted; he was oriented, times three (3); and he had no psychosis. N.P. Smith and Dr. Corder found Plaintiff was "maintaining baseline." Plaintiff's prescription for Pristiq was continued (R. 693).

On January 29, 2010, it was noted, by an clinician at DeFelice Care, relative to Plaintiff's use of the BiPAP machine, that Plaintiff "went to sleep fine but [woke] up feeling like he [was] suffocating and [had] anxiety attacks" (R. 737).

In a February 15, 2010, letter from Dr. Torres-Trejo to Dr. Mason, Dr. Torres-Trejo wrote that Plaintiff stated that he was "doing much better regarding his seizures on Lamictal" and was tolerating the medication well. Plaintiff reported that there were times he felt as if he was going to have a "spell, but nothing happened." Plaintiff stated he had difficulty keeping the BiPAP machine in place while he slept, but it was "helping him when he [wore] it for a couple of hours." Dr. Torres-Trejo informed Dr. Mason that Plaintiff continued to medicate with Lamictal and his neurological examination was normal. Dr. Torres-Trejo diagnosed temporal lobe seizures (R. 568, 623).

On February 23, 2010, Plaintiff met with N.P. Smith relative to medication management. Plaintiff stated he was not sleeping well. His energy level was normal. He was depressed, anxious, and felt irritable. Plaintiff reported he had fewer seizures; they occurred sporadically. Plaintiff reported he reduced Xanax to three (3) pills per day and nausea medicine to one (1) pill per day Plaintiff stated he continued to "get out"; he sometimes "struggle[d] to do things" because of anxiety.

Plaintiff did not want to change his medications. N.P. Smith found Plaintiff was cooperative; he was well groomed; his activity level, speech, and affect were normal; he was oriented, times three (3). N.P. Smith found Plaintiff was "maintaining baseline." She continued his prescription for Pristiq and noted he was also medicating with Ambien, Xanax, Phenergan, Nexium and Lamictal (R. 694).

Plaintiff participated in counseling with Dr. Muir on February 24, 2010. He stated he had increased anxiety and nausea and felt "like [he was] waiting for a spell" especially when he was not busy. He had ended a relationship with a friend; he was bored at home; his friend's family had an "issue" with his sexual orientation; nobody "want[ed]" him. Plaintiff reported he had requested an increase in his dosage of Lamictal, but the doctor refused. Dr. Muir found Plaintiff was sad and euthymic; his thought process was logical; and his behavior and functioning were normal (R. 598).

It was noted, on February 24, 2010, that Plaintiff had used his BiPAP machine nine (9) times from January 18, 2010, to February 18, 2010 (R. 736).

Plaintiff engaged in counseling with Dr. Muir on March 4, 2010. Plaintiff reported he had experienced another "spell." His finances were "worse," and he felt "guilty taking so much from [his] parents." Plaintiff reported he was oversleeping; did not feel motivated; had no energy; was not interested in anything. He had been exercising and had lost almost forty (40) pounds (R. 599).

On March 10, 2010, PA-C Potts refilled Plaintiff's prescription for Nexium (R. 544).

Plaintiff participated in counseling with Dr. Muir on March 12, 2010. He stated anxiety had been "bad." Plaintiff described his anxiety as feeling "shaky inside," trapped, and paranoid. Plaintiff stated he also got nauseous and felt "like a spell" was about to happen, "waiting for it to happen." Plaintiff reported he had an argument with his father about his taking the "checkbook away" and with his mother about smoking. He stated his lawyer did not "know anything" about his Social

Security application, which added financial stress. Plaintiff stated he grinded his teeth at night and his jaw had popped; he had an appointment with an orthodontist. He felt trapped, "like a dog on a leash," especially "at jobs." He was agoraphobic because of panic attacks. Plaintiff stated he experienced one (1) seizure per week now because of the effect of Lamictal; he used to have ten (10) or twelve (12) seizures per week (R. 600, 754).

Plaintiff stated to Dr. Mason on March 16, 2010, that he had undergone a "surgical procedure in December, gotten an infection," and was hospitalized for four (4) days; had been diagnosed with temporal lobe seizures, which he medicated with Lamictal; and had undergone an upper endoscopy and colonoscopy and received a "probable" diagnosis of irritable bowel syndrome (R. 601, 740).

On March 23, 2010, Plaintiff reported to N.P. Smith that he was sleeping well and was having more good days than bad days. He had no significant changes or "problems" with his medications. Plaintiff felt anxious; he continued to have seizures and felt nauseous, weak and "drained" afterwards. Plaintiff continued to feel anxious and "trapped" occasionally when he went places. Plaintiff reported he had recently been diagnosed with agoraphobia. N.P. Smith found Plaintiff was cooperative, well groomed, and oriented, times three (3). Plaintiff's activity level was normal; his speech was rapid; and he appeared to be in "good spirits." N.P. Smith found Plaintiff was "maintaining baseline." She prescribed Pristiq and noted Plaintiff medicated with Ambien, Phenergan, Xanax, Nexium, and Lamictal (R. 695, 756).

A clinician at DeFelice Care noted, on March 26, 2010, that Plaintiff was still noncompliant with use of his BiPAP machine (R. 734). It was noted, on March 29, 2010, that Plaintiff had used the BiPAP machine twenty-five (25) times from December 30, 2009, to March 21, 2010 (R. 735).

Plaintiff's request for a CT scan of his lumbar spine was denied on March 30, 2010, because

the "documentation provided did not note conservative treatment of NSAID's (sic) for equal to or greater than 3 weeks and recent physical therapy for equal to or greater than 6 weeks" (R. 741).

Plaintiff participated in counseling with Dr. Muir on March 31, 2010. Plaintiff reported he continued to have "spells," he slept poorly, and he had "crazy" dreams. He became "nauseated + sweaty." He experienced "fits" of agoraphobia and vertigo. Plaintiff had increased anxiety; he vomited "several times" during the week. Plaintiff reported he was participating in physical therapy for his back pain. He stretched, exercised, walked on the treadmill and "tried traction." Dr. Muir found Plaintiff was fearful, thought process was logical, and behavior was normal (R. 753).

Dr. Torres-Trejo corresponded with Dr. Mason on April 15, 2010, relative to Plaintiff's seizure disorder. Plaintiff stated that "Lamictal [was] helping him a lot . . . ." He reported he had had several "spells" but did not believe he had been passing out. Plaintiff stated he was "dealing with his anxiety, and now he ha[d] been told that he ha[d] agoraphobia, and he [was] doing a little better but 'not very good.'" Dr. Torres-Trejo's neurological examination of Plaintiff was unremarkable. Dr. Torres-Trejo noted Plaintiff "most likely" had temporal lobe seizures and had "improved substantially with Lamictal." Plaintiff had no side effect from the drug; Lamictal was "helping somewhat other aspects of his life, including his mood." Dr. Torres-Trejo opined that since Plaintiff was "still having spells, [he] believe[d] that probably he would not be able to engage in a job that (sic) meaningful remuneration" (R. 714). Dr. Torres-Trejo informed Plaintiff he was not permitted to drive a motor vehicle, according to the laws of the State of West Virginia (R. 714-15). Dr. Torres-Trejo found Plaintiff could not engage in "activities that require[d] his total alertness in case he were to have a seizure . . . [he] could not work at this time." Dr. Torres-Trejo noted Plaintiff was not able to have a MRI due to the metal clip in his abdomen; he ordered a CT scan (R. 715).

Plaintiff participated in counseling with Dr. Muir on April 19, 2010. Plaintiff reported he had been diagnosed with temporal lobe seizures, which were "caused by head trauma, severe lack of oxygen or unknown." Plaintiff reported he had had panic attacks and anxiety "around" people. He became "sick to stomach, hands [shook]." Plaintiff reported he had driven to pick up his mother from a relative's house, and his encounter with the relative caused him to have a severe panic attack, during which he had projectile vomiting and diarrhea for two (2) days. Plaintiff felt "very alone." Plaintiff reported that, "all [his] life" he "fear[ed] . . . dying in [his] 30's. So this [was] really scary." Dr. Muir found Plaintiff was euthymic, logical, and had normal behavior (R. 752).

Plaintiff's April 27, 2010, right knee x-ray showed intra articular loose bodies, arthritic changes, and no acute bony abnormality (R. 724-25).

Dr. Mason noted, on April 27, 2010, that the request for Plaintiff to get a CT scan of his lower spine had been denied. Dr. Mason wrote that Plaintiff's last CT scan was 2007; he had completed twelve (12) weeks of physical therapy; he medicated his back pain with anti-inflammatory medications; and he had undergone traction; however, Plaintiff still experienced worsening "daily lower lumbar pain, especially with radiation and radiculopathy with paresthesias down the leg." Dr. Mason noted Plaintiff required a CT of his lower spine because the "next step would probably be surgery, but the neurosurgeon will not see him without an updated CT scan" (R. 739).

It was noted, on April 29, 2010, that Plaintiff had used the BiPAP machine thirty-seven (37) times from December 30, 2009, to April 26, 2010 (R. 733).

On May 10, 2010, Plaintiff reported to N.P. Smith that he experienced some difficulty falling and staying asleep. He had no signs or symptoms of mania. He was depressed. Plaintiff stated he had been diagnosed with temporal lobe seizures; he had "financial worries"; and he had "concerns

about how debilitating his seizure d/o [would] be." N.P. Smith found Plaintiff was oriented, times three (3). His activity level, speech, and affect were normal. N.P. Smith found Plaintiff was having "situational difficulties." She continued Plaintiff's prescription for Pristiq and noted he medicated with Ambien, Xanax, Phenergan, Nexium, and Lamictal (R. 696, 757).

Plaintiff participated in counseling with Dr. Muir on May 18, 2010. Plaintiff reported his back x-ray showed "2 disks out" and his knee x-ray showed "arthritis . . . [and] chips of something." He stated his knee "went out" years ago, and his back condition could be a birth defect. Plaintiff reported he had had three (3) seizures in April and one (1) in May. He stated the seizures were "triggered" by anxiety, activity, such as exercising on a treadmill, and getting hot. Plaintiff stated he did not "like" himself "anymore"; he had no energy; he did not get out of bed; he "hardly" went "out of the house"; he did not watch television; he lay in bed in "dead silence"; he felt alone; and his moods were "horrible." Plaintiff stated he had not received "word" from Social Security Administration about his claim. Dr. Muir found Plaintiff was sad, fearful, worried, and a "bit" agitated. Plaintiff had thoughts about harming himself (R. 751).

Plaintiff's May 20, 2010, brain CT scan showed no abnormality (R. 716).

Dr. Torres-Trejo wrote to Dr. Mason on May 24, 2010, relative to Plaintiff's seizure disorder. Plaintiff had had "only two spells since I saw him last." Plaintiff stated he felt tired with Lamictal but wanted to continue taking the medication because it was "helping him." Dr. Torres-Trejo's neurological examination of Plaintiff was unremarkable. Dr. Torres-Trejo noted Plaintiff's head CT scan was normal and recommended Plaintiff continue medicating with Lamictal. Plaintiff was instructed to return to Dr. Torres-Trejo in six (6) months (R. 712).

Clinician James Phillips of Northwood Health Systems reviewed Plaintiff's medication

management notes from March 23, 2010, to May 10, 2010, and concluded Plaintiff should continue "pharmacological management services for management of his anxiety and depression" (R. 758-73).

Plaintiff participated in counseling with Dr. Muir on June 3, 2010. He stated he had not been using his BiPAP machine correctly and Medicaid was going to discontinue paying for it. He had knee, hip and back pain. He did not "allow" himself to stay in bed. He went out to lunch with his father; he went to the pool. Dr. Muir found Plaintiff was euthymic; his thought process was racing; his behavior was hyperactive (R. 750).

Dr. Justin Douglas completed a otolaryngology evaluation of Plaintiff on June 15, 2010. Plaintiff reported he had not tolerated his CPAP machine due to claustrophobia. He complained of mild nasal congestion and obstruction and intermittent sneezing, itchy and dry eyes, and a runny nose. Plaintiff stated he had never undergone allergy testing (R. 742). Plaintiff reported to Dr. Douglas that he medicated with Flonase, Lamictal, Xanax, Nexium, Pristiq, Phenergan, Restoril, and Deplin (R. 743). Plaintiff denied fevers, changes in vision, chest pain, shortness of breath, urinary difficulty, bruising, and bleeding. Plaintiff stated he had changes in weight, anxiety, stomach pain, joint pain in the form of arthritis, knee, leg and back weakness and numbness, and excessive thirst. Upon examination, Dr. Douglas found Plaintiff's eyes, head, face, external ears, external auditory canals, tympanic membranes, oral cavity, larynx, neck, thyroid, lungs, and skin were intact. Plaintiff's nose showed a slightly pinched nasal valve on the left and swollen inferior turbinate. Plaintiff was neurologically intact. Dr. Douglas diagnosed obstructive sleep apnea and allergic rhinitis. Dr. Douglas found Plaintiff's "best chance of improving his sleep apnea was to lose some additional weight." Dr. Douglas noted Plaintiff's body mass index was thirty-five (35), and he would benefit from a body mass index of thirty (30). Dr. Douglas instructed Plaintiff to get his

CPAP machine adjusted "so that he may better tolerate the settings" (R. 744). Dr. Douglas noted that Plaintiff could "gain some benefit from better control of his allergies" (R. 744-45). Dr. Douglas found Plaintiff would not benefit from surgery "because his tonsils [were] fairly small and his septum [was] fairly straight," surgery would moderately reduce apnea and hypopnea events, and he would still have to use the CPAP. Dr. Douglas prescribed Flonase, instructed Plaintiff to continue Alavert, instructed Plaintiff to use saline irrigation in his nasal passages, and encouraged him to "seek an adjustment" on the CPAP machine (R. 745).

Plaintiff participated in counseling with Dr. Muir on June 17, 2010. Plaintiff reported that Dr. Douglas said he did not have to have surgery now and thought Plaintiff was allergic to something in the BiPAP machine. Plaintiff stated he had had two (2) seizures in June. One was "long," and "wiped" him out. He could not "get out of it"; it caused him to be very weak. Plaintiff stated he had felt "fine for a few days," but no longer did due to his interaction with others. Plaintiff stated he attempted to be active by "get[ting] out" and walking. Plaintiff stated he attempted to be "more assertive," independent and respected. Dr. Muir found Plaintiff was euthymic; his thought process was logical; he was hyperactive (R. 749).

On July 1, 2010, Dr. Torres-Trejo corresponded with DeFelice Care, Inc., relative to Plaintiff's use of the BiPAP machine. Plaintiff stated that, when he used the BiPAP machine, he felt "rested, awake and that his overall wellbeing (sic) [was] improved"; his mood and alertness were better. When he did not use BiPAP, he experienced excessive daytime sleepiness. Plaintiff informed Dr. Torres-Trejo that if he had been non-compliant, it was "because he [had] other conditions such as claustrophobia which may [have made] it somewhat difficult to tolerate his BiPAP machine[,] but that (sic) despite of (sic) that (sic) he [tried] to sue (sic) it as much as he [could]." Plaintiff reported

45

he, at times, woke up and the mask would be off his face. Dr. Torres-Trejo informed Plaintiff that he should use the BiPAP "as much as he" could; Plaintiff stated he would be compliant. Dr. Torres-Trejo requested that Plaintiff be approved for continued use of BiPAP (R. 731).

Plaintiff participated in counseling with Dr. Muir on July 2, 2010. Plaintiff reported he had had four (4) seizures in June and two (2) were "bad." He had increased lower back and hip pain and "sleep issues." Plaintiff stated he had regulated his BiPAP machine and was "doing a bit better" with it. Plaintiff was "exhausted all the time." He "trie[d] [to do] things" and was "keeping self busy so [did not] get as [depressed]." Plaintiff reported he had "several severe panic attacks," especially when he was in a small car. He shopped at Walmart. Dr. Muir found Plaintiff was euthymic; his thought process was logical; his behavior was normal (R. 748).

Plaintiff received emergency counseling services from Dr. Muir on July 9, 2010. Plaintiff reported he had had a "really bad week." He was "jittery," "snappy, nasty, short tempered." Plaintiff stated his head felt "crazy, weird" and that his "body [was] out of [control]." Plaintiff reported he could not say "some words." He was "forgetting" and losing "brain power." Plaintiff stated he could not "grab" things, his stomach churned, and he was anxious. Plaintiff stated his anxiety was "pent up" and he had "no one to vent to" but Dr. Muir. Plaintiff worried that he was "really facing brain surgery." Plaintiff stated there was "so much" he did not "know," control or anticipate. His back and hip hurt. Plaintiff reported he was being treated by a chiropractor who was "trying something new – scary." Dr. Muir found Plaintiff was sad, fearful, and agitated (R. 747).

On July 12, 2010, an individual from DeFelice Mobility, Inc., corresponded with Dr. Torres-Trejo, informing him that the "documentation provided indicated non-compliance with usage of the BiPAP" by Plaintiff; therefore, BiPAP was not medically necessary and Plaintiff's request for

continued use was denied (R. 730).

Plaintiff received chiropractic care on July 12, 2010, July 14, 2010, July 21, 2010, July 23, 2010, and July 26, 2010, for tightness, soreness, and stiffness in lower back (R. 698-711).

Plaintiff participated in counseling with Dr. Muir on July 23, 2010. He reported he stopped medicating with Flonase and Restoril. He stated he was short tempered, felt "blah," had no initiative, and was "ready to snap." Plaintiff reported he was claustrophobic in his car and had had four (4) seizures that month. He stated he felt "bipolar - so up & down." He had to "drag self out of bed in a.m." He avoided "clusters." Plaintiff reported he felt "muffled, spinning, dizzy, crazy, heavy, . . . confused" and had hip and back pain. Dr. Muir found Plaintiff's mood was fearful, his thoughts were racing, and his behavior was agitated (R. 746).

On July 26, 2010, Plaintiff presented to Dr. Marra upon referral by Dr. Mason. Plaintiff stated he had occasional swelling, pain, "cracking," "popping," and "giving way" in his knee. Plaintiff reported he medicated with Xanax, Nexium, Pristiq, Phenergan, Lamotrigine, and Restoril. Upon examination, Dr. Marra found Plaintiff had "full range of motion and no ligamentous instability." Plaintiff was positive for "some medial joint line tenderness and lateral joint line tenderness and moderate pain with compression of the patellofemoral joint." Plaintiff was "neurovascularly grossly intact." He had no calf tenderness. He had good range of motion of the hip. Dr. Marra found "a little tenderness over the greater trochanteric region." Dr. Marra noted Plaintiff's right knee x-ray showed arthritis and "loose body in the patellofemoral region along with some moderate degenerative changes"; he diagnosed right knee moderate degenerative joint disease. Plaintiff decided to undergo knee arthroscopy (R. 717, 720).

It was noted, on July 27, 2010, that, from January 17, 2010, to July 26, 2010, Plaintiff had

used his BiPAP machine for eighty (80) days (R. 727).

On August 2, 2010, Plaintiff reported to N.P. Smith for medication management and stated he was not sleeping well, felt depressed and anxious, had mood swings, was impulsive, had irrational and racing thoughts, had extreme mood changes, and went "from perky to crying to irritable." Plaintiff stated he spent more time in bed, was less motivated, and had less interest in "things." Plaintiff stated the occurrence of panic attacks had been elevated. When he would go "out," he felt "like walls closing in, [felt] like shirt tightening around his neck w/sensation of suffocating." N.P. Smith found Plaintiff's activity level was normal; his rate of speech was rapid; his affect was normal; he was cooperated; he was oriented as to person, place and time. N.P. Smith found Plaintiff was "having difficulty," prescribed Pristiq, and noted she may prescribe Lithium in the future (R. 774).

On August 8, 2010 (see Court Transcript Index/Exhibit No. 35F), Dr. Mason wrote a narrative of Plaintiff's conditions and treatments since July 2007. Dr. Mason listed the following conditions for which he, and other physicians, had treated Plaintiff: an "open ended Hemo clip left inside from a previous gallbladder removal surgery," which had "traveled over the years and [was] now located near the seminal vesicle"; PTSD; severe anxiety; panic attacks; sleep deprivation; crying spells; nightmares; and vomiting "spells that cannot be controlled." Dr. Mason wrote that these "issues" prevented Plaintiff from "being able to leave the home for days at a time." Dr. Mason noted Plaintiff experienced panic attacks when he was in public; he could not breathe, he sweated, and he became nauseated. Dr. Mason wrote that Dr. Mehta "discovered he has a hiatal hernia and Gastritis (sic)," which did not contribute to Plaintiff's "nausea, vomiting, sweats (sic) etc." Dr. Mason noted that Dr. Torres-Trejo had diagnosed temporal lobe seizures, which he medicated and which still occurred. Dr. Mason wrote that Plaintiff had been diagnosed with severe sleep apnea,

for which he used a BiPAP machine, but, due to his "irregular sleep patterns and claustrophobia," it was "hard [for Plaintiff] to wear this machine for more than a few hours at a time." Dr. Mason wrote that Plaintiff had had suicidal ideations and had sought inpatient treatment at Northwood Health Systems; however, Plaintiff did not remain because the "facility made things a lot worse for him, being out of his home, the strange people around, feeling of being locked inside with no way out." Plaintiff received counseling through Dr. Muir for her diagnoses of agoraphobia, panic attacks, severe anxiety, fear of public and social situations. He had a treatment plan through Northwood, which included medication for depression and bipolar disorder. Dr. Mason wrote that Plaintiff experienced back, leg and knee pain due to "2 discs out . . . in his back with a nerve pressing on the disc causing swelling, aching and a burning feeling around the lower back going down the hip and toward the knee." Plaintiff had "gone through" physical therapy for this condition and was presently being treated by a chiropractor. Plaintiff's knee pain was caused by "water on the knee which was drained several years ago," lose (sic) bone mass, arthritis, and "several bone chips floating inside the knee causing the knee to pop in/out when trying to walk or stand." Dr. Mason wrote that Dr. Marra would be performing "knee surgery to remove the foreign body and bone chips that are rubbing against and making the joints weak." Dr. Mason opined that, due to Plaintiff's mental and physical state, he was "unable to work and or (sic) hold down a position of any type." Plaintiff's seizures prohibited him from "lifting heavy items and or (sic) exerting himself to the point of sweating or being involved in stressful situations as they all increase the frequency of those seizures." Dr. Mason found Plaintiff was not able to sit or stand "at a position due to the back, hip, leg and knee problems that prohibit him from standing, walking or sitting for periods of time. This problem also affect[ed] his sleep patterns as mentioned above as well." Dr. Mason noted Plaintiff's "lack of schooling to

which he did not graduate High School (sic), his mental and physical conditions as well stated (sic) he still need[ed] and [was] being monitored and continued by all above parties mentioned (sic) [Plaintiff] [was] not able to continue the day to day routines of what a normal person without the above problems could. He still require[d] the same treatments as he has since October of 2007" (R. 755).

Plaintiff presented to N.P. Smith on August 10, 2010, for continued medication management. Plaintiff stated he was depressed and anxious. His mind continued to race and he had impulsive thoughts. Plaintiff stated he was "ready to try Lithium." N.P. Smith found Plaintiff was cooperative; his activity level and speech were normal; his affect was blunted; he was oriented, times three (3). N.P. Smith opined Plaintiff had no psychosis. She found Plaintiff was "at a compensated baseline." She ordered blood work and prescribed Pristiq and Lithium (R. 775).

On August 16, 2010, Dr. Torres-Trejo issued a letter "as per" Plaintiff's request that read that Plaintiff "was found to have temporal lobe seizures," he was "still having clinical events although they are mild," and Dr. Torres-Trejo was "adjusting his medications to improve them" (R. 776).

Plaintiff was admitted to Wheeling Hospital on August 18, 2010, for right knee arthroscopy with removal of loose body (R. 777). Plaintiff stated his knee "'lock[ed] up at times" and would swell (R. 786). The procedure was performed on August 19, 2010, by Dr. Marra. His post-operative diagnosis was for right knee loose body, lateral meniscal tear, and patellofemoral chondroplasty. Plaintiff tolerated the procedure well (R. 795-96). Plaintiff was discharged to home. He was instructed to place an ice pack on his knee, keep it elevated, change the dressing in three (3) or four (4) days, leave dressing off when wound was dry, begin physical therapy in one (1) week, and ambulate with weight bearing as tolerated (R. 805).

Dr. Muir completed a Mental Capacity Assessment (Treating Physician) on Plaintiff on August 30, 2010. In the "Understanding and Memory" category, Dr. Muir found Plaintiff was not significantly limited in his abilities to remember locations and work-like procedures and understand and remember very short and simple instructions. Dr. Muir found Plaintiff was moderately limited in his ability to understand and remember detailed instructions (R. 813).

As to Plaintiff's ability to sustain concentration and persistence, Dr. Muir found Plaintiff was not significantly limited in carrying out very short and simple instructions, sustaining an ordinary routine without special supervision, and making simple work-related decisions. Dr. Muir found Plaintiff was moderately limited in his ability to carry out detailed instructions and ability to work in coordination with or proximity to others without being distracted by them. Dr. Muir found Plaintiff was markedly limited in his ability to maintain attention and concentration for extended periods, ability to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, complete a normal work day and work week without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods (813).

In the "Social Interaction" category, Dr. Muir found Plaintiff was not significantly limited in his ability to ask simple questions, request assistance, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness. Plaintiff was moderately limited in his ability to accept instructions and respond appropriately to criticism from supervisors. Dr. Muir found Plaintiff was markedly limited in his ability to interact appropriately with the general public, get along with coworkers or peers without distracting them ,or exhibit behavioral extremes (R. 813-14).

In the "Adaption" category, Dr. Muir found Plaintiff was not significantly limited in his

ability to be aware of normal hazards and take appropriate precautions. Plaintiff was moderately limited in his ability to travel in unfamiliar places or use public transportation and in his ability to set realistic goals or make plans independently of others. Dr. Muir found Plaintiff was markedly limited in his ability to respond appropriately to changes in the work setting (R. 814).

Administrative Hearing

On September 22, 2010, ALJ Cannon conducted an administrative hearing (R. 35). Plaintiff testified he "went through 12th grade" but did not graduate (R. 39). Plaintiff testified he had a valid driver's license and drove "maybe a few hundred" miles per week because he had "a lot of appointments in Morgantown" (R. 40). Plaintiff stated he last worked in March, 2009 (R. 41-2).

Plaintiff testified he had participated in physical therapy and had been treated by a chiropractor (R. 45-6). Plaintiff stated he was "trying and getting better" about using his CPAP machine. He "definitely notice[d] a difference when" he was able to use it, but he was "very claustrophobic" so using it was a "struggle." (R. 46). Plaintiff had right knee surgery in August, 2010 (R. 47). Plaintiff stated he admitted himself to a psychiatric hospital two (2) years earlier because he was having seizures, he felt "like [he] was going crazy," and he had suicidal thoughts. Plaintiff stated he had remained in the hospital for less than twenty-four (24) hours because he had "entrapment" issues, which made him feel "worse and overriding everything else" (R. 48). Plaintiff testified his most recent seizure had been on September 17, 2010; it was "mild." A "weird feeling" came "over" him, and he felt chilled, dizzy, and nauseous. During some seizures, Plaintiff's right hand would tremble and he slurred words. They lasted for fifteen (15) seconds to a "few minutes" (R. 49). After the seizure, he felt fatigued, nauseated and emotionally drained. Plaintiff stated he had three (3) to seven (7) seizures per month and he required no hospitalization for them (R. 50).

Plaintiff testified he had participated in counseling every two (2) to four (4) weeks for the past two (2) years (R. 51). Plaintiff participated in medication management once per month (R. 52).

Plaintiff testified he saw Dr. Mason, his primary care physician, once every month. Plaintiff testified that he had monthly appointments with his "Morgantown" doctor (R. 52-3). Plaintiff stated his "teeth [were] starting to thin out" due to "vomiting and stuff."

Plaintiff testified he had taken Lamictal since September, 2009, and it caused him to be "lethargic, tired, very worn out" and nauseous (R. 49). The dosage had been increased but he was "not at the cap-out yet" (R. 50).

Plaintiff stated if he was "having a seizure," it was a "low-impact day." He lounged, vacuumed, brushed the dog, and did "just things inside the home basically." Plaintiff shopped with his father. He dusted (R. 53). He sometime did the laundry; he did not cook; he did not have hobbies; and he occasionally visited with his sister. Plaintiff stated he could not exert himself because of seizure activity (R. 54). Plaintiff testified he would spend "a bad day" in bed (R. 55). Plaintiff testified he had "maybe 15 or 20" bad days per month. Plaintiff stated the symptoms for panic attacks were sweating, nausea, vomiting, and feeling trapped (R. 56). Plaintiff testified he did not lift more than twenty (20) pounds (R. 58). Plaintiff stated he shifted when he sat due to burning and pulling in his back. He could stand or walk for ten (10) minutes before he experienced pain (R. 59). Plaintiff testified the seizures were his most debilitating condition (R. 60).

The ALJ asked the VE the following question:

> If you take a person of the claimant's age, education, background and work experience, who can do a range of light work with occasional posturals; should avoid extremes of temperatures, both heat and cold; avoid hazards such as dangerous moving machinery and unprotected heights; needs a sit/stand option; avoid vibrations; avoid climbing such as dangerous moving – climbing, such as ropes, ladders, scaffolds or anything of that nature; no kneeling or crawling or crouching

required.

Entry-level (sic), unskilled, routine and repetitive work with things as opposed to people; limited contact with the public, co-workers and supervisors; no production line work; no intense concentration required; little decision-making (sic) and a stable environment. Could that hypothetical person perform the claimant's prior relevant work? (R. 64).

The VE responded that such a hypothetical person could not perform Plaintiff's prior work; however, the VE found such a person could perform the jobs of monitoring a machine, inserting machine operator, photographic machine operator, and folding machine operator (R. 64-65).

**Evidence Post ALJ Decision Submitted to Appeals Council**

Plaintiff Dr. Marra's August 19, 2010, operative report relative to Plaintiff's right knee arthroscopy was submitted to the Appeals Council (R. 829-30).

Plaintiff participated in physical therapy on September 1 and 4, 2010 (R. 827-28).

On September 3, 2010, Dr. Marra examined Plaintiff relative to his right knee arthroscopy. Dr. Marra found Plaintiff had good range of motion; the wound was well healed; he was neurovascularly grossly intact, he had no calf tenderness, he had negative Homan's. Dr. Marra instructed Plaintiff to "slowly and gradually increase his activities as he tolerate[d]." Dr. Marra prescribed Vicodin; he instructed Plaintiff to "call if he [had] any problems at all" (R. 820).

Plaintiff presented to Dr. Torres-Trejo on November 29, 2010, relative to his "still having seizures." Plaintiff had kept the following log of the number of seizures he had experienced: September, 2009 - twelve (12); October, 2009 - thirty-eight (38); November, 2009 – sixty-one (61); December, 2009 – two (2); January, 2010 – three (3); February, 2010 – possibly two (2); March, 2010 – possibly six (6); April, 2010 – possibly three (3); May, 2010 – "2 and 2 (afraid spell with depression)"; June, 2010 – four (4); July, 2010 – seven (7) "(one verbal)"; August, 2010 – three (3);

September, 2010 – five (5); October, 2010 – four (4); and November, 2010 – two (2) "(one sleeping issues and one afraid spell)" (R. 842-43). Dr. Torres-Trejo noted that Plaintiff's seizures were "characterized mainly by aura of fear and occasionally with confusion." Plaintiff stated the seizures had "improved substantially . . . over time." Plaintiff had no new symptoms. Plaintiff medicated with Lamictal, Nexium, Xanax, Phenergan, Restoril, and Flonase (R. 843).

Upon examination, Dr. Torres-Trejo found Plaintiff was in no distress, and he was alert and oriented, times three (3). His memory, attention, concentration, speech, language, cranial nerves, gait, motor strength throughout, muscle tone, sensory, and coordination were normal (R. 843). Dr. Torres-Trejo found Plaintiff's seizures had "improved in severity" and were less frequent "over time." Plaintiff tolerated Lamictal well; Dr. Torres-Trejo increased Plaintiff's dosage (R. 844).

A note was made by a case manager at Northwood Health Systems on October 13, 2010, that Plaintiff had demanded that he "be put on different medications – lithium and also with wanting his diagnosis changed for social security review . . . ." It was noted that a letter had been sent to Plaintiff on September 10, 2010, "informing him of his med check and he did not attend nor (sic) reschedule." Plaintiff's treatment at Northwood was terminated because Plaintiff did not follow treatment recommendations. Plaintiff's service outcome was not measured "due to lack of treatment involvement" by Plaintiff (R. 869).

Dr. Muir wrote a letter to Plaintiff's counsel on December 24, 2010, relative to Plaintiff's application for Social Security benefits having been denied. Dr. Muir wrote that either the Social Security Administration "misunderstood" her use of the term "'moderate'" or she misunderstood the Administration's definitions of moderate and severe. She noted that the reason the Administration did "not think [Plaintiff's] difficulties [were] severe [was] that he [had] never been fired and [had]

not been the subject of domestic disputes." Dr. Muir noted Plaintiff "removed himself from the workplace" before he had been fired and "moved in with his parents" before he had been evicted because he "trie[d] very hard to be responsible and do what is right." Dr. Muir wrote that Plaintiff can "relate adequately" to the "'safe'" people in his life, i.e., family, long-term friends, her, but "panic attacks continue[d] to happen in other arenas of his life" (R. 816). Dr. Muir opined that Plaintiff's "being able to speak with safe, familiar persons [did] not preclude that [Plaintiff] may be severely impaired in other situations, especially situations in which such safe persons are not present." Dr. Muir "maintain[ed] that [Plaintiff] ha[d] marked limitations in his ability to maintain attention and concentration *in a work environment for extended periods*, to perform activities *within a schedule set by someone else*, **to** *maintain for extended periods of time* regular attendance and by (sic) punctual within customary tolerances, **to** (sic) *day after day* (sic) *complete a normal workday and workweek without interruptions from psychologically based symptoms*, to interact appropriately *with the general public*, to get along with coworkers and peers *without distracting them with anxiety attacks or behavioral extremes*, and **to** *respond appropriately without anxiety or panic attacks to changes in the work setting*" (R. 817).

On December 27, 2010, Dr. Mason completed a Medical Report Form of Plaintiff. Dr. Mason answered the question "What treatment are you currently providing the patient?" and listed the "[c]ondition for which you are treating patient" as "see dictation." Dr. Mason found Plaintiff's overall response to prescribed treatment was "limited." Dr. Mason listed "no lifting > 20 lbs." as Plaintiff's only medical restriction (R. 834). Dr. Mason found Plaintiff could, in an eight (8) hour work day, sit for a total of two (2) hours at a time and for the entire day, stand for a total of one (1) hour at a time and for the entire day, and walk for a total of one (1) hour at a time and for the entire

56

day.  Plaintiff could lift less than twenty (20) pounds and could occasionally carry up to twenty (20) pounds a day.  Plaintiff could perform repetitive actions with both his right and left hands (R. 835). Plaintiff could push/pull and perform fine manipulation with no limitations.  Dr. Mason found Plaintiff could use his left foot for repetitive movement, but not his right foot. Dr. Mason found Plaintiff could occasionally bend, squat, crawl, climb and reach.  Dr. Mason opined Plaintiff had no restrictions in his being around moving machinery or exposure to changes in temperature and humidity.  Dr. Mason found Plaintiff had mild restrictions in his exposure to dust, fumes and gases. Dr. Mason found Plaintiff had moderate limitations in his exposure to unprotected heights and driving automotive equipment (R. 836).

On January 19, 2011, Dr. Marra examined Plaintiff's right knee.  Plaintiff reported he experienced "a lot of swelling, popping, giving out and pain."  Plaintiff had" tried ice and elevation but" those treatments did not "help much."  He had not injured his knee.  Upon examination, Dr. Marra noted Plaintiff had "good range of motion and no ligamentous instability" and "significant lateral joint line tenderness, minimal medial joint line tenderness and mild pain with compression of the patellofemoral joint."  Dr. Marra found Plaintiff had good hip range of motion.  He was neurovascularly grossly intact; he had no calf tenderness; his Homan's was negative.  Dr. Marra found "[x]-rays, AP, lateral and sunrise (sic) of the right knee show moderate degenerative changes, especially laterally" and diagnosed moderate degenerative joint disease of the right knee.  Dr. Marra discussed weight loss, physical therapy and NSAID treatment with Plaintiff.  Plaintiff informed Dr. Marra that he was "considering gastric bypass" Plaintiff was instructed to return as needed (R. 822).

On January 31, 2011, Plaintiff was examined by Drs. Torres-Trejo and Baghshomali. Plaintiff reported he had had three (3) seizures from November through January, tolerated the

medication well, and had no "other neurological symptoms." Plaintiff described his seizures as "staring spells and filling (sic) of fear as the aura prior to it." Plaintiff stated he did not sleep well, attempted to use his BiPAP machine "as much as possible," and was scheduled for gastric bypass surgery on February 23, 2011 (R. 845). Upon examination, Plaintiff was alert and oriented, times three (3). His memory, attention, concentration, language, speech, cranial nerves, gait, coordination, sensory exam, muscle tone, reflexes, and motor strength were normal. Dr. Baghshomali diagnosed complex partial seizures and increased Plaintiff's dosage of Lamictal (R. 846).

Plaintiff participated in counseling with Dr. Muir on March 29, 2011. He reported he medicated his back pain with Vicodin, was "down to 2 Xanax" per day, and continued to medicate with Pristiq and Lamictal. Plaintiff reported his back was "getting worse" and his knee hurt "more than before" the surgery. Plaintiff stated he was not "talking" to his mother, which reduced his stress level. Plaintiff stated he felt "incapable of achieving anything anymore." He felt lost, dependent, and "almost like giving up." He was "losing hope in regaining inner strength and self confidence." He experienced increased anxiety. Plaintiff reported the insurance company denied coverage for gastric band surgery but would approve gastric bypass. Plaintiff stated his weight affected him mentally and physically. He felt as if he were going to die early. Dr. Muir found Plaintiff was anxious; his thought process was logical; his behavior and functioning were normal (R. 839).

On May 3, 2011, Plaintiff reported to Dr. Torres-Trejo that he was still having seizures (R. 851). He had had four (4) in December, 2010, January, and February, 2011; three (3) in March, 2011; and five (5) in April, 2011. Plaintiff described the March and April seizures as "more events of aura" (R. 852). Plaintiff medicated with Vicodin, Lamictal, Nexium, Xanax, Phenergan, Restoril, and Pristiq (R. 852-53). Plaintiff "expressed satisfaction" with the reduced frequency of seizures.

Upon examination, Dr. Torres-Trejo found Plaintiff was alert and oriented, times three (3). His memory, attention, concentration, language, speech, cranial nerves, gait, coordination, sensory exam, muscle tone, muscle strength, and reflexes were normal. Dr. Torres-Trejo diagnosed complex partial epilepsy and tiredness. Dr. Torres-Trejo found Plaintiff's seizures had "improved in severity and frequency over time," and he was tolerating Lamictal well. He discussed epilepsy surgery and vagus nerve stimulator with Plaintiff; he prescribed Lamictal (R. 853).

Plaintiff participated in counseling with Dr. Muir on May 3, 2011. Plaintiff stated he was still having seizures and his medication had been increased. He was "tired all the time." Plaintiff reported he had increased seizures when he sweated, he got nervous, or he increased his activity, such as mowing the grass. He had an upcoming appointment with a physician relative to gastric bypass surgery. Plaintiff stated he was "scare[d]" of gastric bypass surgery because food was "very social" for him; he would have to "start cooking at home," which would cause him to "lose a big avenue for social outlets." Plaintiff stated a doctor instructed him to "think about" vagus nerve stimulator, and he found this "scary." Plaintiff stated he "need[ed] to get this stuff done so [he could] move on." Plaintiff reported increased pain in his "right side." Plaintiff stated he knew "what he need[ed] [to do to] turn [his] life around," but he did not have the "energy or self-esteem" to do it. He stated the "aura of having a seizure" was more prevalent. Plaintiff stated he needed to develop "more fighting skills for self." Dr. Muir found Plaintiff was fearful and stressed; his thought process was logical; his behavior and functioning were normal (R. 866).

On May 17, 2011, Plaintiff participated in counseling with Dr. Muir. Plaintiff reported he medicated with Vicodin, Lamictal, Pristiq, and Xanax. Plaintiff reported he did not meet the criteria for gastric bypass surgery and would not be having it; he was not approved for a back CT scan;

standing and bending caused back pain; his back "pull[ed] and burn[ed]"; he had arm numbness; his skin crawled; he was afraid of the unknown; he had "to fight" with himself to "get self [to go] out again"; he felt sick "often in the afternoon" and evening; he did not "believe" in himself; he felt "stuck"; the arthritis in his leg and knee was "getting worse"; the "smallest task [felt] overwhelming" to him; and he had undergone traction, physical therapy and massage therapy for his back and "now" the doctor was "talking . . . [about] shots." Dr. Muir found Plaintiff was fearful, his thought process was logical, his behavior and functioning were normal (R. 865).

Plaintiff participated in counseling with Dr. Muir on June 15, 2011. Plaintiff reported his Social Security claim had been denied. He felt lost, hopeless, confused, and empty. He was uncomfortable around people and with himself. He had back and leg pain. He was physically exhausted. He continued to have seizures; he vomited; he sweated; his "skin crawl[ed]." Plaintiff stated he was fifty (50) pounds heavier than he was last year. Plaintiff had mood changes "due to physical issues and financial issues." Dr. Muir found Plaintiff was sad, angry, and fearful; had logical thought process; and had normal behavior and functioning (R. 864).

On July 12, 2011, Plaintiff participated in counseling with Dr. Muir. He reported he had more frequent "episodes," one of which left him "dazed, confused." Plaintiff had "highs and lows." He felt "crazy." Plaintiff was "stressed" by his family and with finances. He spent "so much time in bed." His knee and back hurt. He was "ready to consider vagus nerve stimulator" (R. 863).

Plaintiff presented to Dr. Torres-Trejo on July 25, 2011, with complaints of increased frequency of seizures. Plaintiff reported he had "more auras," "long stare," and felt "exhausted/groggy afterwards." Plaintiff had no tongue biting or incontinence (R. 855). Plaintiff reported he had had six (6) seizures in June and five (5) in July, 2011. Plaintiff reported

experiencing auras from March through July, 2011. Plaintiff informed Dr. Torres-Trejo that the insurance company denied coverage of bariatric surgery. Plaintiff medicated with Lamictal, Vicodin, Nexium, Xanax, Phenergan, Restoril, and Pristiq (R. 856). Upon examination, Dr. Torres-Trejo found Plaintiff was alert and oriented, times three (3). His memory, attention, concentration, language, speech, cranial nerves, gait, coordination, sensory exam, muscle tone, muscle strength, and reflexes were normal. Dr. Torres-Trejo diagnosed complex partial epilepsy, sleep apnea, and tiredness. Dr. Torres-Trejo found Plaintiff's seizures had "improved in severity and frequency over time." Dr. Torres-Trejo found that Plaintiff's "events have become more frequent and triggered by stress. He admit[ted] [he had] been anxious and he [knew] that when he [was] stress (sic) out he ha[d] more events." Dr. Torres-Trejo went on to opine that "[h]er (sic) events have not really improve (sic) on the higher dose of Lamictal since I saw him last. . . . I feel that since his seizures are not under control, and getting worse in recent past, I will ask [Plaintiff] to undergo work up for possible epilepsy surgery" (R. 857). Plaintiff stated he wanted to get a second opinion about his seizures. Dr. Torres-Trejo prescribed Lamictal and referred Plaintiff to Dr. Bhatia (R. 858).

Plaintiff participated in counseling with Dr. Muir on July 27, 2011. He stated he had found a snake skin under his car and had been "freaked out." He had not been sleeping well; his "spells" had increased; he hoped he would die; he felt paranoid and scared; he had been crying; and he had gained weight. Plaintiff reported he had been evaluated by a neurologist earlier in the week, who "want[ed] [him] back in [hospital] for a week on EEG." He questioned if he should go through surgery and if he would die during surgery. He was overwhelmed. His father was his best friend. Dr. Muir found Plaintiff was sad and fearful; his thought process was logical; his behavior was normal; and he had passive ideations about harming himself (R. 862).

Plaintiff underwent a medical necessity assessment at Northwood Health Systems on August 4, 2011, relative to his request for a medication review. He had been experiencing anxiety symptoms; had a hemoclip in his body; had "spells" involving confusion, change in speech, hand shaking, and feeling chilly; had bipolar disorder; had panic with agoraphobia; was fearful and cried; and had PTSD. Plaintiff stated "there were questions of head trauma and other symptoms" (R. 870).

Plaintiff's ability to function was analyzed. It was found Plaintiff had no limitation in maintaining adequate personal hygiene, walking or getting around, grooming, recognizing and avoiding common dangers, making and keeping appointments, or managing medications. He required guidance in following through on health care advice. He required some assistance with maintaining a healthy diet. Plaintiff needed no assistance in performing household chores, taking care of his possessions and living space, handling personal finances, shopping, treating minor physical problems, preparing meals, traveling, using transportation, or obtaining assistance in an emergency. He needed advice or guidance in accessing and using community services. Plaintiff had "somewhat typical functioning" in his ability to communicate clearly, ask for help, respond to other's social contact, engage in social or family activities, and assert himself effectively and appropriately. His functioning was "generally not typical" when he formed or maintained a social network or handled conflict with others. Plaintiff was not limited in managing family or interpersonal obligations. He always functioned in a typical manner when remembering locations and procedures, understanding and remembering instructions, performing activities within a schedule, maintaining attendance, being punctual, sustaining an ordinary routine without special supervision, performing at a consistent pace without an unreasonable number or lengths of rest periods, and completing simple tasks without errors or assistance. Plaintiff never exhibited maladaptive, dangerous, or

impulsive behaviors, except he expressed suicidal threats once a month (R. 878). He was diagnosed with general anxiety disorder (R. 879).

M. Roberta Welling, a psychologist at Northwood, noted Plaintiff requested "to re-establish psychiatric services with same provider" because that provider had helped him and knew him. He reported he had an evaluation scheduled with a neurologist and he may have surgery "at some point." Ms. Welling recommended a psychiatric evaluation of Plaintiff "for diagnostic clarification" in order to rule out bipolar disorder or other diagnoses and evaluate medications (R. 880).

Plaintiff participated in counseling with Dr. Muir on August 17, 2011. Plaintiff reported he was not "calm enough [to do] the hypnosis today." He had become ill on the way to counseling. He had been very busy and was "wound up." He continued to "have . . . spells." Insurance denied coverage for the PET scan he had scheduled for August 18, 2011. He was scheduled to meet with a brain surgeon, "then stay over for a week EEG." Dr. Muir found Plaintiff was stressed (R. 861).

Plaintiff's August 22, 2011, CT scan of his lumbar spine showed spondylolisthesis with spondylosis at L5 in respect to S1, concentric bulging of the L5-S1 disc and vacuum degeneration, and possible encroachment of the intervertebral foramina bilaterally at L5-S1 (R. 911).

On August 30, 2011, Dr. Stephen Corder, completed a Psychiatric Evaluation of Plaintiff. Plaintiff reported he had been diagnosed with temporal lobe epilepsy. Two years earlier, Plaintiff stated he had had thoughts of suicide; had been depressed; had "'highs, lows, mood swings'"; was vomiting "all the time"; could not leave the house; and had been fearful and paranoid. Plaintiff could not "describe specifically anything occurring recently and described everything as occurring in the past." Plaintiff stated "all his symptoms remained the same since 2007." Plaintiff "described considerable relief from medications." Plaintiff stated he "lived in fear at home." He kept the drapes

pulled and tiptoed so he would make no noise; he feared someone would locate him and accost him.

Plaintiff stated "he had various episodes of distinct periods of changes in his mood but then he recanted that and said his symptoms overall have been constant, chronic and unchanging" and "fluctuate[d] only in severity." Plaintiff reported his mood varied "from minute to minute" and "there's no pattern." Plaintiff stated he felt very paranoid, regardless of his mood state. Plaintiff stated he felt euphoric at times, and he got manic (R. 888). Plaintiff had thoughts of suicide two (2) years earlier. Plaintiff stated "a lot of his symptoms [were] the result of having temporal lobe seizures," which he had "occasionally." Plaintiff described his seizures as lasting fifteen (15) seconds, causing vomiting, making him lethargic and "'zoned,'" and causing auditory and visual distortions. Plaintiff would mumble, have disorganized thoughts and speech, and his hands would tremble. Plaintiff's moods were "constant[,] chronic[,] unstable[,] and uncertain." Plaintiff stated that "one minute he [felt] he [could] take on the world and the next minute" he was "'tired, crying and [felt] all depressed.'" Plaintiff stated this moods "especially" occurred if he was having a seizure; when he was not having a seizure, he felt paranoid. Plaintiff stated he was constantly depressed, he had no energy, he was not motivated, and he had no ability to function. Plaintiff denied hallucination, slept poorly, and had pain on one side of his body. Plaintiff stated he could not eat due to vomiting and nausea, but he ate excessively when he was depressed. Plaintiff did not have any intrusive thoughts, habits, rituals or repetitive behavior, except for checking locks (R. 889).

Plaintiff reported he was prescribed 5mg of Xanax a day; he "lined up to 'take seven a day' and then said that he took five a day every day and never any more or any less." Plaintiff also medicated with Pristiq, Nexium, Phenergan, Lamictal, and hydrocodone (R. 890).

Plaintiff reported he had been admitted to Northwood two (2) years earlier, had to "'fight

[his] way out,'" and thought he would receive immediate help, but "there was all this group therapy and stuff.'" Plaintiff was prescribed psychiatric medications by Dr. Mason; he medicated with Pristiq, Xanax, and Lithium, but he stopped taking Lithium because he feared he would become addicted to it. Plaintiff stated his paranoia began when he was told a clip was left in his body during a 2002 gallbladder surgery and the clip could perforate his colon and kill him. Plaintiff reported he had been involved in several motor vehicle accidents, but had sustained no head injury in them. Plaintiff stated he did not graduate high school; he did not get his GED. He worked in hair salons and "was very successfully (sic)." Plaintiff stated he became unable to work in 2008 (R. 890).

Upon mental status examination, Dr. Corder found Plaintiff was "casually attired and fairly well groomed. He was noted to be carrying a purse, which might be a fashionable male accessory in certain geographic locations but gave him an abnormal appearance in this locale." Plaintiff was pleasant, relaxed, and sat "slumped in his chair." Plaintiff "never [showed] any evidence of pain or discomfort." Plaintiff's stream of thought was fluent and focused, "but at times was tangential and rambled a bit." Plaintiff reported an increased startle response. When asked to elaborate on his answers, Dr. Corder observed Plaintiff "got irritated and retorted irritably." Plaintiff was cognitively intact; his gross estimation and intellectual level was near average; he laughed and smiled appropriately; he was not guarded; he was not suspicious; he was oriented as to person, place and time; he could perform simple calculations; he interpreted proverbs abstractly and appropriately; his judgment was intact; and his immediate recall was intact (R. 890-91).

Dr. Corder diagnosed mood disorder, NOS. Dr. Corder wrote "consider bipolar disorder, type 2, mixed with psychotic features - vs - Major Depression, recurrent, severe with psychotic features or even Schizoaffective Disorder; consider Psychotic Disorder, NOS related to features of

chronic post traumatic stress disorder; consider Mood Disorder due to temporal lobe epilepsy." Dr. Corder instructed Plaintiff to "taper off Xanax" until his medicates with .25mg as needed. Dr. Corder continued Plaintiff's prescription for Pristiq and "consider[ed] addition of lithium." Dr. Corder's found Plaintiff's prognosis was poor, "given the organic factors, chronic nature of his illness and substance use issues that he's reluctant to alter" (R. 891).

On September 4, 2011, Ms. Wendel reviewed Dr. Corder's psychiatric evaluation of Plaintiff and recommended Plaintiff continue receiving pharmacological management (R. 892-908).

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ Cannon made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.

2. The claimant has not engaged in substantial gainful activity since October 20, 2007, the alleged onset date (20 CFR 404.1571 *et seq.* and 416.971 *et seq.*).

3. The claimant has the following severe impairments: degenerative disc disease, back; degenerative joint disease, knee; sleep apnea; seizure activity; anxiety disorder; and affective disorder (20 CFR 404.1520(c) and 416.920(c)) (R. 19).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926) (R. 20).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except claimant is limited to occasional postural maneuvers; must avoid temperature extremes, both heat and cold; must avoid hazards, such as dangerous moving machinery and unprotected heights; must avoid vibrations; must never climb ladders, ropes, or scaffolds; must avoid kneeling, crouching, and crawling; and must be provided a sit/stand option. In addition, claimant is limited to entry level,

unskilled, routine and repetitive work; claimant should work primarily with things rather than people; should have limited contact with the public, co-workers, and supervisors; must avoid production line work; must avoid occupations which require intense concentration; is limited to occupations with little decision making; and must have a stable working environment (R. 22-23).

6.    The claimant is unable to perform any past relevant work   (20 CFR 404.1565 and 416.965).

7.    The claimant was born on May 21, 1976, and was 31 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English.  (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.  (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.   (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a) (R. 27).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from October 20, 2007, through the date of this decision.  (20 CFR 404.1520(G) and 416.920(g) (R. 28).

## IV.  Discussion

### A.  Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a

conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (<u>quoting</u> <u>Consolidated Edison Co. v.</u> <u>NLRB</u>, 305 U.S. 197, 229 (1938)).  Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'"  <u>Shively v. Heckler</u>, 739 F.2d 987, 989 (1984) (<u>quoting</u> <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1968)).  In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law."  <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir.  1987).

### B.  Contentions of the Parties

The Plaintiff contends:[1]

1.       He meets the medical criteria for a Listed Impairment.

2.       The jobs the VE identified are not local and do not meet his restrictions.

3.       The wording sounds like his case isn't believable to them.

4.       Dr. Mason has been there every step for the past 4 years.

5.       The ALJ gives one-time examining doctors more weight "than all the doctor

[s] that I've seen in the past 4 years."

6.       The decision says he has a high school diploma, and he does not.

The Commissioner contends:

1.       Plaintiff did not show that his spinal impairment met or equaled Listing 1.04 (Defendant's brief at p. 9).

---

[1] Plaintiff is proceeding pro se, and the undersigned has therefore identified as best possible, the important issues in the case.

2.      Dr. Mason's and Dr. Muir's Opinions were not consistent with the evidence of record (Defendant's brief at p. 10).

3.      Substantial evidence supports the ALJ's comprehensive RFC assessment and finding that Plaintiff's allegations were partially credible (Defendant's brief at p. 12).

4.      Plaintiff's level of education was accurately established at the hearing (Defendant's brief at p. 14).

## C. Evaluation of Listings

Plaintiff argues that he has more than significant spinal stenosis and does meet the medical criteria (of Listing 1.04). Defendant contends Plaintiff did not show that his spinal impairment met or equaled Listing 1.04. At step three of the sequential evaluation process, the ALJ must determine whether the claimant's impairment or combination or impairments meets or medically equals the criteria of an impairment listed in 20 CFR part 404, Subpart P, Appendix 1(20 CFR 404.1520(d), 404.1525, 404.1526. 416.920(d), 416.925, and 416.926). If the claimant's impairment or combination of impairments meets or medically equals the criteria of a listing and meets the duration requirement (20 CFR 404.1509 and 416.909) the claimant is disabled. If it does not, the analysis proceeds to the next step.

In <u>Cook v. Heckler</u>, 783 F.2d 1168 (4th Cir. 1986), the ALJ found that the claimant did not meet Listing 1.01. The Fourth Circuit noted that listing consisted of four subsidiary lists of impairments, and that the ALJ did not compare the claimant's symptoms to any of the four subsidiary lists of impairments. The Fourth Circuit then held:

> The ALJ should have identified the relevant listed impairments. He should then have compared each of the listed criteria to the evidence of Cook's symptoms. Without such an explanation, it is simply impossible to tell whether there was substantial evidence to support the determination.

In this case the ALJ found Plaintiff does not have an impairment or combination of impairments that

meets or medically equals one of the listed impairments. She then wrote her findings in a narrative fashion, as follows:

> Indeed, while it is noted that the claimant's degenerative disc disease, back; degenerative joint disease, knee; sleep apnea; and seizure activity result in some limitations, there is no evidence that they have resulted in the requisite gross anatomical deformity; chronic joint pain and stiffness; limitation of motion; joint space narrowing; bony destruction; ankylosis; compromise of a nerve root or the spinal cord; nerve root compression; spinal arachnoiditis; inability to ambulate effectively; loss of pulmonary function; loss of consciousness; convulsive seizures; residuals which interfere significantly with activities during the day; alteration of awareness; or transient postictal manifestations of unconventional behavior necessary to meet or equal Listings 1.00, 3.00, 11,00, or any other listing . . . . . In fact, while a CT scan of the lumbar spine performed in September 2007 revealed narrowing of the L3-4 disc space, with diffuse annular bulge of the disc; grade I spondylolisthesis of L5 onto S1, with bilateral spondylolysis of the pars interarticularis of L5; and an apparent right lateral herniated disc at the L5-S1 level . . .there was no evidence of significant spinal stenosis or encroachment of the neural foramina . . . .

Listing 1.04A requires:

> 1.04 *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

In this case it is undisputed that Plaintiff has degenerative disc disease of the spine. A September 19, 2007, CT scan of his lumbar spine showed narrowing of the L3-L4 disc space "with diffuse annular bulge of the disc noted, but no significant spinal stenosis or encroachment on the neural foramina" was detected; and "Grade I spondylolisthesis of L5 onto S1 with bilateral spondylolysis of the pars interarticularis of L5." There appeared to be a "right lateral herniated disc demonstrated at L5-S1

70

on the right, which [was] starting to compress the nerve root on that side." A year later, orthopedic surgeon Dr. Schmitt completed an consultative examination of Plaintiff. Plaintiff reported lumbar pain that radiated to the right lower extremity and right lower extremity numbness, tingling and buckling, and stated he had difficulty "negotiating stairs or uneven terrain." Upon examination, Dr. Schmitt found Plaintiff's gait was slow and he limped on the right. His straight leg raising test was positive on the right at thirty (30) degrees and forty-five (45) degrees on the left. Plaintiff could get up on and down from the examination table with mild difficulty. He could not heel and toe walk, squat or hop on the right knee. Plaintiff's ranges of motion were "free and full" except for the lumbar spine, "where ventral flexion is limited to 30 degrees." He had "decreased pinprick sensation at dermatome levels L4/L5 in the right lower extremity."

Dr. Schmitt found Plaintiff had a "history of back injury and clinical signs consistent with a herniated and/or bulging disc. CAT scan has confirmed this dated 9/19/2007." Dr. Schmitt's impressions were for multiple arthralgias, chronic low back syndrome, severe lumbar strain with right radiculopathy, "decreased range of motion of lumbar spine for ADL," and "significantly impaired gait for ADL" (R. 340).

The evidence in the record shows Plaintiff meets the first part of 1.04A. The ALJ found Plaintiff had no limitation of motion, compromise of a nerve root; or nerve root compression. There is, however, at least evidence of nerve root compression; limitation of motion of the spine; positive straight leg raising; and decreased sensation; and inability to ambulate effectively. The undersigned finds this is evidence that Plaintiff may meet or equal Listing 1.04A.

Listing 11.03 for nonconvulsive epilepsy (petit mal, psychomotor, or focal), requires a documented, detailed description of a typical seizure pattern, including all associated phenomena;

occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day. Here the ALJ found Plaintiff did not have alteration of awareness, transient postictal manifestations of unconventional behavior; or residuals which interfered significantly with activities during the day.

The evidence of record includes Plaintiff's complaints of "spells" since at least February 2009, which he stated manifested themselves in slurred speech and inability to talk. He stated he had up to ten seizures per day, and that they wiped him out. He was referred for possible petit mal seizures.

Prior to seeing the specialist, Plaintiff saw Brandi Ruckman, an employee of an insurance agency, to pay a bill. Ms. Ruckman wrote a "to whom it may concern" letter, stating:

> Glen Miller was in to pay his insurance premium on April 20, 2009. While talking to Glen all of a sudden he got this glazed look in his eyes he grabbed the desk and stopped talking almost like he was in another world. The look on him was like help me. I gave him a look like are you okay and when he started to talk again he was slow to talk and there were pauses and it looked like he did not know where he was or what he was doing. He was hard to hear and it was like he was mumbling. It was as if he did not know what was going on and when it was over he looked really tired in his eyes like he was completely exhausted. This lasted I know a good 3 minutes to get him to not have the gaze in his eyes and to talk.

The next day, Plaintiff presented to Nurse Practitioner Smith for medication management. She described Plaintiff's "right hand tremoring and [Plaintiff] silent/staring. Lasted approx. 30-45 seconds before responding." She diagnosed a possible seizure disorder.

Plaintiff was evaluated by specialist Dr. Torres-Trejo on August 2009, for "episodes of confusion." After finding abnormalities on Plaintiff's two head CT scans, Dr. Torres-Trejo ordered multiple-day EEG monitoring of Plaintiff's brain. During the first two days of monitoring, Plaintiff

"pressed the button twice." Dr. Torres-Trejo noted: "On the second event he appeared to be confused and the EEG showed some changes in rhythm in the form of what appeared to be delta activity better seen on the left side of the head." Dr. Torres-Trejo found that "[b]ecause of the changes in rhythm and morphology in the EEG and also the clinical event suggests that this is an ictal event." On the third day of monitoring, Plaintiff had "a clinical event." The only clinical manifestation was Plaintiff's "right hand with sort of automatic movements. However, on the EEG there was a clear change in rhythm on the left hemisphere which suggested that the seizures probably arise from the left temporal area. The above clinical event and the EEG changes is (sic) compatible with an ictal event." Plaintiff was diagnosed with a seizure disorder, prescribed Lamictal ( a seizure medication) and informed that he should not drive, swim or bathe alone.

Plaintiff continued to treat with Dr. Torres-Trejo. Seven months after he began treatment, the doctor stated that medication was helping Plaintiff "a lot" but he was still having spells, and would therefore probable not be able to engage in a job with meaningful remuneration. He also informed Plaintiff he was not permitted to drive a motor vehicle according to the laws of the state of West Virginia, and found Plaintiff could not engage in "activities that require[d] his total alertness in case he were to have a seizure . . . .[he] could not work at this time."

At the hearing, Plaintiff testified that his most recent seizure had been three days before, and was mild. He testified he had three to seven per month, they lasted for 15 seconds to a few minutes, and afterward, he felt fatigued, nauseated, and emotionally drained.

It is undisputed and undisputable that Plaintiff has a seizure disorder. There are two detailed descriptions of seizures by one by an insurance agent and one by a health care provider, as well as objective evidence by a specialist and EEG monitoring that corroborates the two descriptions.

The undersigned finds substantial evidence does not support the ALJ's determination that plaintiff did not have alteration of awareness, transient postictal manifestations of unconventional behavior, or residuals which interfere significantly with activities during the day. The evidence also shows Plaintiff continued to have seizures, at listing-level frequency, even after a year of treatment.

In <u>Cook</u>, the court found "ample evidence" in the record to support a determination that the claimant's impairment met or equaled a listed impairment. The undersigned finds there is not sufficient evidence in the record as it stands to conclude that Plaintiff meets or equals a listed impairment. Substantial evidence, however, does not support the ALJ's determination that he did not meet or equal any listing, and the undersigned therefore recommends the case be remanded for a proper evaluation of these listings.

### D. Treating Physician Opinions

Plaintiff argues that the ALJ erred by according more weight to State agency non-examining physicians and one-time examining physicians than to his long-time treating physicians. Defendant contends that Dr. Mason's and Dr. Muir's Opinions were not consistent with the evidence of record. Upon review of the decision, the undersigned includes Dr. Torres in this discussion of treating physicians.

"Although it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it." <u>Craig v. Chater</u>, 76 F. 3d 585, 589 (4th Cir. 1996). The treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." <u>Mitchell v. Schweiker</u>, 699 F.2d 185 (4th Cir. 1983).In <u>Craig</u>, the Fourth Circuit held:

Circuit precedent does not require that a treating physician's testimony "be given controlling weight." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,

> [i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

> By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.

20 C.F.R. § 404.1527 states:

> (c) *How we weigh medical opinions.* Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion

>> (1) *Examining relationship.* Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

>> (2) *Treatment relationship.* Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply

the factors listed in paragraphs (c)(2)(I) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(I) *Length of the treatment relationship and the frequency of examination.* Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a umber of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

(ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability.* The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) *Consistency.* Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) *Specialization.* We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty

than to the opinion of a source who is not a specialist.

(6) *Other factors.* When we consider how much weight to give a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

In Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir. 1984), the Fourth Circuit stated:

We cannot determine if findings are supported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. See, e.g., Myers v. Califano, 611 F.2d 980, 983 (4th Cir. 1980); Stawls v. Califano, 596 F.2d 1209, 1213 (4th Cir. 1979); Arnold v. Secretary, 567 F.2d 258, 259 (4th Cir. 1977). As we said in Arnold: The courts . . . face a difficult task in applying the substantial evidence test when the Secretary has not considered all relevant evidence. Unless the Secretary has analyzed all the evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's "duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." 567 F.2d at 259. Neither the ALJ nor the Appeals Council indicated the weight given to the various medical reports submitted by the appellant. We therefore remand to the district court with instructions further to remand the case to the Secretary with directions to the Secretary to reconsider the case and to indicate explicitly the weight accorded to the various medical reports in the record.

Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *5 (July 2, 1996) provides for the

explanation of the weight to be given to a treating source's medical opinion, as follows:

Paragraph (d)(2) of 20 CFR 404.1527 and 416.927 requires that the adjudicator will always give good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s), i.e., an opinion(s) on the nature and severity of an individual's impairment(s). Therefore:

When the determination or decision . . . is not fully favorable, e.g., is a denial . . . .

The notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent

reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR96-5p, 1996 WL 374183, at *1 through *5 (July 2, 1996) provides for evaluation of opinions on issues that are reserved to the Commissioner, as follows:

> Medical sources often offer opinions about whether an individual who has applied for title II or title XVI disability benefits is "disabled" or "unable to work," or make similar statements of opinions. In addition, they sometimes offer opinions in other work-related terms; for example, about an individual's ability to do past relevant work or any other type of work. Because these are administrative findings that may determine whether an individual is disabled, they are reserved to the Commissioner. Such opinions on these issues must not be disregarded. However, even when offered by a treating source, they can never be entitled to controlling weight or given special significance . . . .

> Because treating source evidence (including opinion evidence) is important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make "every reasonable effort" to recontact the source for clarification of the reasons for the opinion.

> Treating source opinions on issues reserved to the Commissioner will never be given controlling weight. However, the notice of the determination or decision must explain the consideration given to the treating source's opinion(s).

> When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(I) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

In this case, the ALJ notes that treating physician Mason opined that it would be impossible for Plaintiff to maintain any type of employment, and that Plaintiff's combination of impairments result in an inability to maintain day to day routines. The discussion of Dr. Mason's opinion then simply concludes:

> Unfortunately, Dr. Mason has not prepared a Medical Source Statement and none of his notes provide a function-by function analysis of claimant's physical abilities.

78

Furthermore, Dr. Mason's opinions are not entirely consistent with claimant's self-reported activities. As a result, Dr. Mason's opinions have been given <u>appropriate</u> weight.

(R. 25).

The discussion of consulting, examining physician Schmitt similarly provides:

Dr. Schmitt reported that claimant displayed range of motion in all areas that were within normal limits, except with regard to flexion-extension of the lumbar spine and straight leg raising . . . . Dr. Schmitt further reported that claimant displayed normal speech and hearing; normal mouth and throat; normal respiratory rate and movements; normal heart rate and rhythm; and no cyanosis, edema, or clubbing of the extremities . . . It is noted that Dr. Schmitt has not provided a Medical Source Statement with a function-by-function analysis of claimant's abilities and that his opinion is based on a one-time examination of claimant. Given these facts, this opinion is given appropriate weight.

The ALJ also accorded consulting, examining psychologist Holly Coville's opinion "appropriate weight," noting that it was based on a one-time evaluation and that she did not provide a Medical Source Statement with a function-by-function analysis of claimant's abilities. She then also accorded non-examining State Agency physicians Franyutti, Lauderman, and Kuzniar "appropriate weight."

The only opinions for which the ALJ provided an express weight were those of treating psychologist Muir and State Agency psychologist Hursey, which were both accorded "little" weight. The sole reason for according the treating psychologist's opinion little weight is that it "is not consistent with the record as a whole or with claimant's self-reported activities," with no further explanation.

More importantly, the undersigned finds the decision totally omits any discussion of neurologist Torres-Trejo, who diagnosed Plaintiff's seizures, opined Plaintiff could not work, and

advised Plaintiff that driving was illegal with his condition. The ALJ finds the fact that Plaintiff continued to drive a few hundred miles a week (albeit mostly to doctor appointments) is inconsistent with the multiple doctors' opinions that he was disabled. While true Plaintiff admitted driving, according to Dr. Torres-Trejo, he was to report his seizure activity to the DMV and could not <u>legally</u> drive.

Based upon all of the above, the undersigned finds the ALJ's discussion of the treating physician's opinions does not comply with the regulations or rulings regarding treating physician opinions. Further, the omission of certain important treating providers from the decision, in particular, Dr. Torres-Trejo, on its own requires remand.

### E. Credibility

Having already found that substantial evidence does not support the ALJ's findings at Step Two or the weight accorded to Plaintiff's physicians, it follows that substantial evidence also does not support the ALJ's finding that Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms are not credible to the extent they are inconsistent with his residual functional capacity assessment.

### F. Hypothetical to the VE and Availability of Jobs

Having already found that substantial evidence does not support the ALJ's findings at Step Two, the weight she accorded Plaintiff's treating physicians, or her credibility analysis, it follows that substantial evidence does not support the hypothetical to the Vocational Expert and the ALJ's reliance on the jobs identified by the Vocational Expert.

## G. Educational Level

The undersigned finds the plaintiff's actual educational level (attending through the 12th grade, but without graduating) was established at the hearing prior to the VE testimony. Further, the undersigned finds the error on the ALJ's part in the decision is harmless, as it would not affect a finding for a claimant of Plaintiff's age. Nevertheless, because the undersigned has already found the claim should be remanded for other reasons, upon remand the Commissioner shall make the proper determination of Plaintiff's education.

## V. CONCLUSION

Based on all of the above, the undersigned United States Magistrate Judge finds substantial evidence does not support the ALJ's determination that Plaintiff has not been under a disability as defined in the Social Security Act, from October 20, 2007, through the date of her decision. Plaintiff, however, proceeding *pro se*, has only requested the ALJ's decision be reversed and that he be awarded payments. While substantial evidence does not support the ALJ's decision, the undersigned finds there is not enough evidence to recommend simply an award of payments. For example, Plaintiff's seizures appear to have dramatically improved with medical treatment, to the point they may have been disabling for a closed time period, but not the entire period. Questions such as this should be addressed on remand.

## VI. RECOMMENDATION

For the reasons herein stated, I find substantial evidence does not support the Commissioner's decision denying the Plaintiff's applications for DIB and for SSI. I accordingly recommend Defendant's Motion for Summary Judgment [DE 14] be **DENIED**. Insofar as Plaintiff's

Motion for Summary Judgment requests only that the ALJ's decision be reversed and he be granted payments, I also recommend Plaintiff's Motion for Summary Judgment [DE 13] be **DENIED**. I further recommend this case be **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. section 405(g) for further action in accordance with this Report and Recommendation/Opinion, and that this case be dismissed and stricken from the Court's docket.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record and to Plaintiff, *pro se*, by United States Certified Mail, return receipt requested, at his last-provided address.

Respectfully submitted this _16_ day of January, 2013

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE